## WALDROP v. LEAMAN.

1. Findings of fact by a referee, confirmed by the Circuit Judge, affirmed on appeal, such findings not being clearly without any testimony to support them, nor obviously in conflict with the preponderance of the testimony.

2. In settlements made by a trustee with his *cestuis que trust*, the utmost good faith is required on the part of the trustee. There must be no *suggestio falsi* or *suppressio veri* and no profit made to him; the settlement must be fairly made, without concealment, undue influence, or misleading. But if *cestuis que trust* make a disadvantageous settlement when of full age, *sui juris*, and capable of understanding their rights, with full opportunity of ascertaining them, and advised as to all the circumstances, or in a situation by reasonable diligence to be so advised, they are bound, and the courts will not relieve them from the consequences of their folly.

3. The trustee in this case having made a most advantageous purchase of the interests of the remaindermen, during the life-time of the life tenant, without a full disclosure of the estate in his hands, and with a suppression of the fact that part had been used in the purchase of land to which his wife held titles, the sale was set aside, although one of the *cestuis que trust* had employed counsel at the time, who learned all that the trustee's returns disclosed. MR. CHIEF JUSTICE SIMPSON *dissenting* as to the *cestui que trust* who had employed counsel.

4. But the trustee having afterwards made compromises with some of the debtors to the estate, he should be charged in his accounting only with the amounts received therefrom.

5. This sale having been made and the deed put on record, the sureties on the bond of the trustee were held discharged, in action brought after the death of the life tenant, and three years after the sale.

Before WALLACE, J., Laurens, February, 1888.

This case is elaborately stated in the special master's report, which was as follows:

The master for Laurens County being related by blood to some of the parties to the above stated action, all the issues of law and fact herein were, by consent of all the counsel, referred to me by order of his honor, Judge I. D. Witherspoon, dated 30th September, 1885.

The facts which constitute the basis of this action, and which are set forth in the complaint and admitted in the answers, ex-

cept that of the infant defendant, John D. W. Watts, and which were either expressly admitted or proved on the reference, are as follows :

Robert Workman, of Laurens District, died in 1857, leaving of force a will, by which, among other things, he left one third of his estate to his executor, John D. Williams, in trust for the support of Robert Workman, jr., a son of the testator, during his life ; such share at Robert, jr.'s death to be equally divided among the other children of the testator then living, or the child or children of such child or children of the testator as should at that time be dead, the child or children of such child or children of the testator as shall die before Robert, jr., to take the share its, or their, parent would have been entitled to if living at that time. The executor qualified and undertook to execute the trust ; but in 1866 he was relieved of the trust by order of the Court of Equity on his own application, and Samuel Leaman, a defendant in this action, was appointed by that court trustee of the estate willed to Robert, jr., and gave his bond to the commissioner in the penalty of fifty thousand dollars, with James Bryson, William Leaman (a defendant herein), James Leaman, Mary Waldrop, and the said John D. Williams, as sureties, such bond being conditioned for the faithful performance by the said Samuel Leaman of his duties as such trustee. The testator left two children besides Robert, jr.—William P. Workman and Mary Waldrop. William P. Workman died in 1869, childless and a bachelor ; Mary Waldrop died in June, 1880, survived by her children, the plaintiffs, E. F. Waldrop (commonly called Frank Waldrop), Emma E. Nance, and Mary E. Bryson, and the defendant, Susan L. Leaman, wife of Samuel Leaman, the trustee. Robert Workman, jr., died in June, 1882. Mrs. Mary Waldrop left a grandson, W. V. Winebrenner by name, whose mother (Mrs. Waldrop's daughter) died before her mother. John D. Williams died in 1870. The defendants, Garlington, Mrs. Witherspoon, John G. Williams, Anderson, and John D. W. Watts, are legatees and devisees under his will. The defendant, William Leaman, is one of the sureties on Samuel Leaman's bond.

John D. Williams turned over to his successor, Samuel Leaman, in 1866, money and choses appearing to belong to the trust

estate. Robert Workman, the younger, was *non compos mentis*—an idiot, the general mention of him indicates, or at least extremely idiotic, from an early age. He resided for some of the years of Leaman's trusteeship with one or another of his relations, but stayed in the trustee's house during the last few years of his. life. Some time in the year 1881, the plaintiffs, E. F. Waldrop, Mrs. Nance, and Mrs. Bryson, entered into negotiations with Leaman, the trustee, to procure from him some money on account of their supposed interest in the trust estate. These eventuated in the transaction evidenced by a writing, which was dated 29th October, 1881, which is generally, if not always, termed in the pleadings a *release*, but which I would call a sale, or assignment, of the interests of the three plaintiffs just above named, and also of the interest of Susan Leaman, Samuel's wife, and also of the interest of W. V. Winebrenner, in the trust estate.

This writing was signed and sealed by Mrs. Susan Leaman, Mrs. Bryson and her husband, Mrs. Nance and her husband, Winebrenner and his wife, and the plaintiff, E. F. Waldrop, in the presence of witnesses, and purported—to describe it in general terms—to convey and release to the said Samuel Leaman all their interest in the trust estate, in consideration of the sum of $1,000 paid by him to each of the four following named of the. signers, to wit, Susan Leaman, Mary E. Bryson, Emma E. Nance, and E. F. Waldrop—the sum to be paid Winebrenner not being specified. The proof showed, however, that Winebrenner also. received one thousand dollars. The plaintiffs claim, by their. complaint, that this assignment or release was brought about by. the trustee's "concealment and misrepresentation of material facts concerning said estate," and "by fraud and undue influence.". The instrument of writing also contained the condition, that the trustee should continue to support, maintain, and care for the lunatic, Robert Workman, jr., so long as Samuel Leaman should live and hold the trust, and that his successor in the trust should do the same; and it provided that the failure so to care for the lunatic should operate to annul the transaction of sale and release. The complaint charges that the trustee did not properly care for the lunatic after the execution of the release. All of these

charges are denied by the defendants, except Mrs. Leaman, who does not answer.

The object of this suit is to set aside the assignment and have an account of the estate in the hands of the trustee. The pleadings raise no issue except as to the inducements leading to the execution of the assignment, and the action of the trustee subsequent thereto, which the plaintiffs claim has been such as to avoid the agreement, it being alleged that the trustee did not provide for the lunatic, as he was bound to do—which the defendants deny as a matter of fact. No defendant demurred in writing. At the hearing before me, however, all the defendants demurred orally, on the ground that the complaint does not state facts sufficient to constitute a cause of action. Under this head they urge, 1st, that the suit is premature as to sureties on Leaman's bond, and their representatives, devisees, and legatees, in the absence of a decree against the principal; and 2nd, that there should have first been a suit for the cancellation of the agreement before an account could be demanded.

In regard to the second point of objection, I would say, briefly, that while, as a matter of fact, the instrument of sale and release must be set aside before any accounting can be had, it seems to me to be very well settled that the two things may be demanded in the same action. The annulling of the sale carries with it the duty of the fiduciary to account, just as the cancellation of a fraudulent conveyance by a debtor leads to the application of the property embraced in the deed to the debts of the grantor; and the case of *Dunsford* v. *Brown* (19 S. C., 560), cited for the defendants, does not appear to controvert this view. I find nothing there decided upon this point, except that an accounting should not have been had until the release by the ward to his guardian was annulled; that the pleadings in the action made no issue as to the *bona fides* and validity of the release pleaded by the guardian in his answer; that it was error in the Circuit Judge to allow, at the trial before him, and after the hearing and report by the referee, such an amendment of the complaint as attacked the release; and, therefore, that a judgment in spite of the release was improper. There is no intimation that an attack on the

release and a demand for an account of the estate might not˙ be combined in the same action.

The other point raised by the oral demurrer does not strike mè as well taken. Ever since the decision in *Taylor* v. *Taylor,* 2 Rich. Eq., 123, it has been settled in this State that a fiduciary and the sureties on his bond may be joined as defendants in a suit for an account and settlement of the estate in trust. The cases of *Bird* v. *Houze,* Speer's Eq., 250 ; *Vernon* v. *Valk,* 2 Hill Ch., 257 ; and *Gilliland & Howell* v. *Caldwell,* 1 S. C., 194, have pretty well determined that real estate of a deceased testator in the hands of a devisee, and personal property in the hands of a legatee with the assent of the executor, are not liable to a judgment against the executor ; nay, even that land in the possession of the heir at law, after partition, is not bound by a judgment for the ancestor's debt against the administrator. It is also settled that a creditor can pursue property of a deceased debtor in the hands of a legatee or devisee, and that this should be done in equity by a proceeding to which all the legatees and devisees are parties if the estate of the debtor has been˙ wholly distributed by the personal representative (2 Hill, 522); or if the estate remaining in the hands of the executor appears upon the pleadings to be insufficient to meet the debt (as is alleged in the complaint here), then the proceeding in equity may embrace the personal representative and all the legatees and devisees. 1 McCord Ch., 417. The fact that each party to the suit may not be affected by all that may arise in its progress, as between other defendants, has never, so far as I know, been held to render the joinder of such defendants improper. Putting all these considerations together, I conclude that there is no misjoinder of defendants in this action.

I have thus spoken in regard to the demurrer, because I am anxious to present the whole of this contest as it has been made before me. I must add, however, that I do not consider the foregoing objections properly made by oral demurrer. This form of demurrer, so frequently used in practice under the Code of Procedure, seems to have been derived from the Court of Equity, which being a court of peculiar jurisdiction, both as to the subject-matter of its operation and its modes of relief, would enter-

tain, even at a very late hour in its investigations of a case, and sometimes without suggestion from counsel, objections to the exercise of its authority. It would, therefore, dismiss a bill, for want of power to afford relief, or because there was an adequate remedy at law, although no plea or demurrer to such effect were offered by the defendant. I think the oral demurrer is intended to operate on similar principles; that it should be allowed to prevail only where the complaint fails to state such facts as, being admitted, would show the plaintiff to have a claim against a defendant which a court can and ought to enforce; that the failure must not be one of the other five classes which the code declares grounds for a demurrer; and that it ought not to prevail where the liability of the defendant alleged in the complaint is reasonably deducible from the facts alleged—no matter whether such liability attaches primarily or secondarily to the defendant. Where there is doubt as to the propriety of the objection, I think it ought to be solved in favor of the complaint. This oral demurrer is always a hardship on the plaintiff, and it deserves little encouragement, 1st, because it operates as a surprise; and, 2nd, because the defendant may always make the same defence by written demurrer. I conclude that this demurrer ought to be overruled; and I overruled it so far as a referee may pass on a pleading.

Now, as to the merits of the case. The testimony offered before me was voluminous. For that reason, and because it is filed with this report for the use of the court, I forbear to do more than describe it in its general features. It does not extend to the details of Samuel Leaman's management of the trust estate. I thought it so important to ascertain the character and circumstances of his purchase from the remaindermen and to have a decision upon the validity of that transaction, before stating his account, that I decided to look into his account in its general features only; for I have thought, and still think, that small amounts of money do not deserve to be considered in passing upon such a transaction as was his with the plaintiffs; and that it would be best not to put the parties to the expense of time and trouble required for the investigation of his accounts, until it should be found necessary to state his accounts in full, and thus

28—30

fix accurately his liability, a liability which a decision in favor of his purchase from the remaindermen would determine does not exist. So I declined to see more than the trustee's returns, and to hear more than his explanations of them in general; for by this course I thought he ought to be able to justify his conduct, if it were justifiable, on the one hand, and that, on the other hand, the plaintiffs, having the opportunity to reply to his testimony, would be able to contradict any really gross misstatements of his made in his justification. And I did not assume him to be absolutely chargeable of all that his returns might show against him, until discharged; but treated, and now treat, the returns in only their general character. It is difficult to make this altogether plain by any words of mere description, but I think my plan will be made plain as I proceed, and I still think it was the proper one.

The returns of the trustee show that he received from his predecessor in the trust in 1866 in cash and notes aggregated—the interest on notes being calculated to May 1st, 1866—$27,792.-31, of which sum he states $10,188.17 to have been received in cash on 1st May, 1866, and $154.42 in cash on 12th May, 1866. His expenditures for that year were $122.85, and for the following fourteen years, including the year 1880, were $4,180.06, making his aggregate disbursements for the whole period $4,334.-48. The trustee, in discharge of the liability appearing on his returns, testifies that he did not actually receive the whole of the said sum of $10,188.17 in cash, but that only $500 of it was cash, and the balance in notes which the commissioner in equity (to whom he made this return in 1867), in pursuance of his directions and in pursuance of his agreement with his predecessor, John D. Williams, to that effect, entered as so much cash. He adds that he has not collected all of these notes, but does not say on whom the notes were, or how much he has collected or failed to collect.

This explanation is very peculiar and very unsatisfactory— especially when considered in connection with the rest of the first return. In that return there are two notes designated, each of which then amounted to less than $100, and a third note which is given as $102.64. It is, therefore, not at all likely that it

was the small amount of the notes said to be embraced in the
$10,188.17, which prevented his enumeration and description of
them; for it would have required more than a hundred of the
smallest in his list to make up that sum; nor does he say this,
but says they were treated as cash in consequence of a private
agreement between himself and Col. John D. Williams, his pre-
decessor in the trust. Why such an agreement? Was it because
these were notes on which Leaman was himself either principal
or surety? I do not pretend to say; but I do say that he has not
at all explained away this charge of $10,188.17 in cash which
he made against himself in his return to the commissioner; and
that I am forced to consider that much money in his hands as
trustee when he made his trade with these plaintiffs; for he has
not shown that he did not receive it in legal contemplation, nor
has he pretended that he afterwards invested it in securities
which have become doubtful or worthless.

Among the choses received by the trustee were a judgment
against W. P. Workman, stated in the return for 1866 to have
amounted on 1st May, 1866, to $4,902.92, and a note on the
same person amounting at that date to $2,869.78   It is in proof
that Samuel Leaman was administrator of W. P. Workman's
estate.   His settlement of that estate, made up in the office of
the judge of probate for Laurens County on 13th August, 1883,
shows it to have amounted in November, 1869, to upwards of
nine thousand dollars, and at the time of settlement, after deduct-
ing payments and adding interest, to the sum of $14,700.45—
all of which, according to the settlement, was applicable to the
claims held by Leaman as trustee (styled assignee of John D.
Williams), except the sum of $57.50, which seems to have been
conceded as proper to pay an account against the intestate's
estate.   Now, Leaman testifies that not all of this estate was
ever realized; but does not say how much is lacking.   I do not
say that he is chargeable with the whole sum which appears by
the settlement to have been in hand, because, as Leaman at that
time considered himself the owner of the claims against W. P.
Workman's estate, he may well have not cared to be accurate.

The trustee's testimony shows that he failed to collect a large
part of the notes received by him from Col. Williams; but he

admits that he collected about $1,000 on the Fuller note; that he realized about $4,000 on the Phillips note, of which $500 was in money, the rest about 400 acres of land; that he has realized about $700 on the Golding note, and expects to get $400 or $500 more; and R. C. Watts, Esq., testifies that $200 has been paid on the Leaman and J. G. Williams judgment. Now, these things indicate that the property of the trust estate at the date of the assignment (1881) amounted to about the following:

| | | |
|---|---:|---:|
| Cash received from J. D. Williams, | $10,000 | 00 |
| Amount derived from W. P. Workman's estate, about which is ½ of whole amount applicable to note and judgments held by the trustee in 1883. | 7,000 | 00 |
| Collected from Phillips, at least, | 3,000 | 00 |
| Making a total of | $20,000 | 00 |
| To which is to be added interest received on $10,-000.00 since 1866, after allowing payment, of say, | 5,000 | 00 |
| Making an estate of | $25,000 | 00 |

exclusive of the collections from Messrs. Golding, Fuller, and J. G. Williams, which have amounted to upwards of $2,000. And this exclusive of the liability attaching to Leaman for his neglect to pursue the persons who owed the trust estate—that is to say, it is exclusive of the sums which might have been realized by him if he had exercised that diligence which the law requires of a trustee; and which at this point it is but proper to add that the trustee was exceedingly dilatory in his efforts to collect from the debtors to the trust estate. He sued W. A. Fuller in 1869, which was not an unreasonable delay; but he did not sue John G. Williams until September, 1881; he did not sue Mrs. Golding till April, 1881; he did not sue William Phillips till April, 1881. I do not say—for I do not know—that he would have realized more than he ultimately did from the parties if he had pursued them in a few years after he received their notes. But his delay may have been such as to make him chargeable with a much greater sum than he realized. And this is an element to

be considered in connection with the disparity between the estate he held and the sum for which he purchased that estate—a question to be considered as we proceed to the other matters involved in the case.

Now, as regards the circumstances leading to and attending the sale, assignment, or release by the remaindermen to the trustee, the evidence clearly is, that the trustee did not seek it or encourage it. On the contrary, the movement originated entirely with the remaindermen—one of whom, E. F. Waldrop, as early as 1874 or 1875, when he had but the possibility of an interest, set to work to get money from the trustee in anticipation of any interest which he might afterwards acquire in the estate. The witnesses do not speak very fully on this point, but I suspect that Waldrop, who was very poor and not very thrifty, was the originator and main mover of the matter. It is quite probable that he did not at first intend to sell his interest, but desired to have sums of money advanced to him as his wants or his pleasure might demand. But Leaman very naturally objected to that kind of proceeding as entirely one-sided, and either paid no heed to Waldrop's solicitations or else pointedly refused them.

So matters went on till finally in 1881 Leaman announced that he would buy the interests of all the remaindermen, if all would sell; and he offered to pay $1,000 to each of them. The testimony indicates that each one of the remaindermen desired more than was offered; and there is no doubt in my mind that E. F. Waldrop procured B. D. Cuningham, an attorney at law, to look into the records relating to the trust estate, to ascertain its amount. Waldrop denies that he did so, but I know Mr. Cuningham to be a gentleman of intelligence and veracity, and I believe his statement to this effect. Mr. Cuningham expressed doubt of the sufficiency of the sum offered by Leaman, but Waldrop did not heed him. In view of the purchase of the remaindermen's interest, Leaman had B. W. Ball, an attorney at law, to prepare the assignment and release above mentioned. Mr. Ball prepared the paper under Leaman's instructions, and had no communications with any of the remaindermen.

At this stage of the negotiations, Leaman seems to have become

energetic, and to have sent for the parties to sign the instrument of writing. They profess to have become doubtful when he thus evinced anxiety to effect the purchase, and to have asked certain questions as to the extent and condition of the estate. To these inquiries he gave very vague answers, saying that he might be able to collect a good deal of money on the choses which constituted the estate, or he might not. At this point comes in testimony which I consider clearly inadmissible—to the effect that he promised to pay more than the sum he was about to pay, if the lunatic should die before long. This testimony goes palpably to vary the contract which all the parties afterwards executed in writing.

In their conversation about the extent of the estate, Leaman mentioned several notes, those on Phillips, Fuller, and Golding, as constituting the bulk of the estate, and expressed great doubt as to what could be realized from them. He did not tell them what he had in hand, however. He did not tell them of any cash received by him from Col. Williams, his predecessor. He did not tell them what he had collected from the W. P. Workman estate. He did not tell them that he had purchased the five hundred acres of Waldrop land in part with the funds of the trust estate. It is shown—and not denied by Leaman—that he bought in this land in 1875 at $2.000 ; that $1,500 of this money belonged to the trust estate, and that he had the title made by the sheriff (at whose sale he bought) to his, Leaman's, wife. In these things I discover a *suppressio veri* not consistent with the trustee's duty to the parties. Yet I do not undertake to say that Leaman purposely misled them. On the contrary, he seems to have guarded against anything like positive misrepresentation. But it does not appear that he disclosed the true extent or condition of the estate ; and it does appear that he had hidden away a portion of the estate by having the Waldrop plantation conveyed to his wife.

It is argued by the defence that there was not such confidence and trust between Leaman and the plaintiffs as required him to make a full disclosure to them in regard to the estate, they being mature persons, rational, and at arm's length from him. There is a good deal in this, and I feel free to say that these plaintiffs

have exhibited such foolishness and recklessness as must make them somewhat contemptible before a court of justice.    The arrangement was of their own seeking—as I infer from the testimony—and Waldrop appears to me to have disregarded the information which he received from his attorney.    But Mrs. Nance and Mrs. Bryson do not appear to have taken counsel; and it may be that they only responded to a proposition from the trustee, induced by the demands of their co-plaintiff, Waldrop.

Such a state of facts makes rather a peculiar case.    The most of the leading cases on the subject have arisen out of one or the other of two conditions of affairs, the one being a clear case of imposition upon the *cestui que trust* by positive misrepresentation of facts or by taking advantage of his necessitous condition, or else the trustee has procured the transfer of the estate to himself through some third person.    The cases of *Fox* v. *Macreth* and *Michoud* v. *Girod* were of the latter character.    *Butler* v. *Haskell* was of the former.    This case more nearly resembles the class of English cases arising out of bargains with expectant heirs—although it is to be distinguished from them by the fact that here there could be no disappointment of the ancestor. If Leaman had been a stranger to these people, I should not hesitate to uphold his bargain with them, notwithstanding the great inadequacy of the consideration paid by him; for I take it to be well settled in this State that mere inadequacy will not suffice to annul a contract deliberately made between persons entirely competent to contract.    Very gross inadequacy always constitutes a suspicious circumstance; but this must yield to positive evidence on the one hand, or be disregarded when parties have the opportunity to testify as to unfair means being employed and yet fail to do so.

But a trustee ought not to derive a benefit at the expense of his *cestui que trust;* and it is not sufficient for his justification that there is no positive evidence of unfair dealing on his part. The authorities all declare that his purchase of the trust estate will be examined with the closest—some of them say, the severest—scrutiny.    The liberty of fiduciaries has been enlarged in America partly by judicial decisions, partly by statutory enactments.    But while their purchases of trust property are not neces-

sarily void as they once were, they have almost invariably been held to be voidable for such inadequacy as would not shake the purchase by a stranger. It is the policy of the law that a fiduciary shall not gain at the loss of those whose interests are committed to his care; and, therefore, while he is not forbidden to deal with them, he must not derive such an advantage from the transaction as a person at arm's length from them might lawfully acquire. And this doctrine is carried so far in this State that an administrator or executor purchasing at his own sale, though shown to have bought openly and in full, free competition with other bidders, can be required to account for the full value of any article bid in by him—without regard to the amount bid by him or another.

I cannot concur in the view that the transaction in this case was a release and not a purchase by the trustee. A release would stand on higher ground, for to forgive a debt is often an actual moral duty. But here the trustee bought in choses which belonged to other people and made a profit, as I think, at the expense of those whose interests he was bound to promote.

It is urged that he took considerable risks in paying this $5,-000 and looking to the notes in his hands for reimbursement, especially as he was bound to support the lunatic as long as they both should live, and guaranteed his support even by his, the trustee's, successor. And it is further urged that these plaintiffs had only a contingent interest in the estate, which might be entirely defeated by their death before the lunatic. As a matter of fact, I think their interests became vested and indefeasible at Mrs. Waldrop's death, and therefore that Leaman bought of them an absolutely certain property. But I doubt if these things ought at all to affect the question. I take it that the law intends that trustees shall not speculate in the trust property; that this is a question of public policy more important than the dollars and cents involved in any trade; and that such transactions will not be sustained where they have resulted in any very decided advantage to the trustee.

Such releases as that involved in the case of *Dunsford* v. *Brown* stand on a very different footing; they are conducive to peace and repose—objects enjoying the favor and commendation

of courts of justice. I do not undertake to say how much Leaman was advantaged by this trade, but I think that the apparent disparity between the sum he paid and the amount of the estate in his hands was so great as to require that the bargain between him and the plaintiffs be set aside and an account of the estate taken. I think it but just to him, however, to add that such account ought to be stated with great liberality to him ; for as the assignment to him led him to consider the choses then in his hands as his own property, he made compromises with debtors, which it is not to be believed he would otherwise have thought of. I will say further that though in my opinion Winebrenner had no interest whatever in the estate, Leaman should have credit in his accounts for the whole sum of five thousand dollars as paid on 19th October, 1881. I cannot say that he forfeited his rights by his subsequent treatment of the lunatic. I do not think that he exhibited altogether due regard for the cleanliness and comfort of that unfortunate man, but there seems to have been no material change in the treatment after the trade with the remaindermen, and I presume the lunatic was quite reconciled to that manner of living.

The sureties on Leaman's bond seem to me to occupy a very different position from his. They and their representatives and descendants were lulled into a feeling of security by the agreement between the trustee and the remaindermen, and it is impossible to say how much their course in connection with the trust estate may have been affected by the delay of about three years on the part of the plaintiffs to move for the recission of the contract. That delay was not sufficient to constitute *laches* as regards the trustee, except to the extent above indicated ; but it operated to prevent his sureties, their personal representatives, devisees, and legatees, from taking steps to secure the collection of the trust estate, the assignment being recorded and known to these persons. And I think all these persons should have the benefit of the release. Chancellor Kent considered a delay of twenty months sufficient to exonerate a surety in such a case. *Kirby* v. *Taylor*, 6 Johns. Ch., 242. And the same principle has been held in Kentucky to protect a surety after four years. *Aaron* v. *Mendel*, 78 Ky., 427.

I do not think, however, that this is a case for costs as between the plaintiffs and the defendants other than Samuel Leaman.

I therefore recommend: 1st. That the instrument of bargain, sale, and release, described in the pleadings, be set aside so far as concerns the defendant, Samuel Leaman. 2nd. That the said Samuel Leaman be required to render an account of the estate which went into his hands under the will of Robert Workman, sr., and the proceedings in the Court of Equity, by which the trust estate was transferred from John D. Williams to him, the said Samuel Leaman. 3rd. That the said Samuel Leaman be required to pay the costs of this action. 4th. That as between the plaintiffs and defendants other than Samuel Leaman, the complaint be dismissed, each party as among themselves paying his or her own costs.

J. F. J. CALDWELL, *Referee.*

Exceptions by all parties to this report were overruled by the Circuit Judge in the following decree:

Upon the facts as found by the special referee, and in which finding, from the testimony, I concur, I think the report of the special referee should be confirmed. I have hesitated to do so, because there was no full accounting had, but I am persuaded that a full accounting would only strengthen the view of the referee as to the great disparity between the amount of the trust. fund and the amount paid the plaintiffs.

It is ordered and adjudged, that the report of the special master be confirmed and stand as the judgment of this court.

Plaintiffs appealed on the following grounds:

I. Because his honor erred, it is respectfully submitted, in not overruling the report of the special master herein, in so far as it holds that the sureties on the bond of Samuel Leaman, as trustee, are protected by the agreement entered into by the plaintiffs and Samuel Leaman on the 29th October, 1881.

II. Because his honor erred in not overruling the report of the special master, wherein it holds that the plaintiffs are barred

as against the defendants, other than Samuel Leaman, by reason of the delay in commencing this action.

III. Because his honor erred in not holding that the sureties on Samuel Leaman's bond, their representatives, devisees, and legatees, are liable in this action for any judgment that may be rendered against Samuel Leaman herein on account of his trust.

IV. Because his honor should have held that Samuel Leaman was guilty of positive fraud, misrepresentation, and undue influence in procuring the sale of the trust estate to himself from those entitled thereto under the will of Robert Workman, sr.

V. Because his honor should have overruled the special master wherein he excluded testimony tending to show that the agreement was not meant to be a final settlement of the trust estate.

VI. Because his honor should have overruled the special master wherein he holds that the trustee had received only two hundred dollars on the John G. Williams judgment; that the trustee should have credit for the one thousand dollars paid to W. P. Winebrenner, and that the trustee should not be held to a strict account of the trust estate.

Defendant, Samuel Leaman, appealed on the following grounds:

I. Because his honor erred in confirming the report of the special master in this, and in overruling the exceptions of the defendant, Samuel Leaman, filed to said report and herein set forth, as follows:

*First.* Because the special master erred in overruling the oral demurrer of defendant, that the complaint did not state facts sufficient to constitute a cause of action.

*Second.* Because he erred in finding any facts other than such as went to sustain the material allegations in the complaint, fraud and misrepresentation on the part of Samuel Leaman in reference to the release specially pleaded, he having adopted the scheme in said report and at the hearing of not going into an accounting.

*Third.* Because he erred in charging the trustee with any specific sums, when he failed to take evidence with the view to an accounting, and of discharging the trustee from receipts as returned.

*Fourth.* Because he erred in finding that the trustee received from the original trustee the sum of $10,188.17 ; in charging him with the amount of              , as derived from W. P. Workman's estate ; in finding any specific sum or sums in the trustee's hands, no accounting having been taken.

*Fifth.* Because he erred in fixing the aggregate disbursements of the trustee at $4,334.48, or any other specific sum, when no accounting was had.

*Sixth.* Because he erred in estimating the sum of $2,500 as the amount of the estate in the trustee's hands.

*Seventh.* That he erred in holding that there was any concealment, misrepresentation, or suppression of facts on the part of trustee, Samuel Leaman, as to the trust estate in his hands, which would invalidate the release or assignment set up by the defendants.

*Eighth.* Because he erred in holding that there was any want of diligence or prudence on the part of the trustee in managing his trust, which would invalidate the release or assignment set up by the defendants.

*Eighth.* Because he erred in holding that there was any want of diligence or prudence on the part of the trustee in managing his trust, which would invalidate the said release or assignment.

*Ninth.* That he erred in not holding that the plaintiffs were advised, and had opportunity of being advised and informed sufficiently as to the matters of the estate to make the execution of the release binding on them.

*Tenth.* That he erred in not holding that the paper writing under seal set up by the defendant as a release was a release and a full discharge and settlement of the trust.

*Eleventh.* That he erred in holding that the inadequacy of price was so great as to invalidate the release pleaded, and in not holding that there were other considerations sufficient to support the release in addition to the money payment.

*Twelfth.* That he erred in holding that the plaintiff had a vested interest in the trust estate.

*Thirteenth.* That he erred in not holding that the ordinary relation of trustee and *cestui que trust* did not exist between the

parties plaintiff and defendant, Leaman, when the negotiations for, and execution of, said release were entered into and perfected.

*Fourteenth.* That he erred in finding that there was any suppression of facts in reference to the Waldrop land or any other material fact that would avoid said release and settlement.

*Messrs. Benet & McGowan* and *Moorman & Simkins,* for plaintiffs.

*Messrs. Ball & Watts, H. Y. Simpson, J. S. R. Thomson,* and *Ferguson & Featherstone,* for defendants.

March 23, 1889. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. Some time in 1866 the defendant, Samuel Leaman, was appointed by the court trustee of a considerable fund bequeathed by one Robert Workman to John D. Williams in trust for his imbecile son, Robert Workman, jr., during his life, to be used for the maintenance and support of his said son as long as he lived, and at his death the remainder to be equally divided amongst the children of the said testator then living, or the child or children of such as be dead, "the child or children taking amongst themselves such part as their parent would be entitled to if living." Williams was the executor of the will, and to him, as executor, this bequest for the purposes mentioned was given ; and Leaman, by order of the court, was substituted in 1866 in his stead, as stated. Leaman gave bond for the faithful discharge of the trust, with James Bryson, William Leaman, James Bryson, Mary Waldrop, and the said John D. Williams as sureties, and thereupon took charge of the trust fund, which was turned over to him by Williams.

Robert Workman, the testator, died in 1857, leaving three children, to wit, W. P. Workman, Mary Waldrop, and the *cestui que trust,* Robert Workman, jr. W. P. Workman died in 1869 without any child or children, and Mary Waldrop died in 1880, leaving children, to wit, E. F. Waldrop, Emma E. Nance, Mary E. Bryson, the plaintiffs in this action, and Susan Leaman, the wife of the said Samuel Leaman, and also a grandchild, W. V. Winebrenner, the son of a deceased child. Robert Workman,

jr., the *cestui que trust*, died in 1882. Some time in 1881, after the death of Mary Waldrop, and before the death of the *cestui que trust*, the children of Mary Waldrop, the plaintiffs and defendants here, including the grandson, Winebrenner, and the husbands of the females, in consideration of one thousand dollars to each of said children and to said grandson, by and under seal bargained, sold, assigned, conveyed, and released to the said Samuel Leaman, &c., their entire interest, vested or contingent, in the said trust estate, with the condition that said Leaman was to continue to support and maintain the *cestui que trust* as long as he lived, and upon failure to do so the conveyance was to be null and void. The consideration expressed seems to have been paid, and on October 19, 1882, the deed was recorded in the clerk's office of the county.

The *cestui que trust* died, as stated, in 1882, and on October 2, 1884, the action below was commenced by E. F. Waldrop, Emma Nance, and her husband, W. D. Nance, Mary E. Bryson, and her husband, J. H. Bryson, all of whom had signed the deed aforesaid, to vacate the same, on the ground of alleged misrepresentation of material facts concerning the trust estate, fraud, and undue influence by the said Samuel Leaman in procuring said deed; and also that the said *cestui que trust* had not been properly cared for, and for an accounting as if no such deed had ever been executed. The wife of Samuel Leaman, James Leaman, a surviving surety to the bond aforesaid, the executor of John D. Williams and his devisees and legatees were made parties defendants. The main issue in the case was as to the validity of the deed and release, depending upon the testimony as to the alleged misrepresentations, fraud, and undue influence.

The case was referred to a special referee, Mr. J. F. J. Caldwell, who reported that while there was no actual fraud or purpose on the part of the trustee, Leaman, to mislead the other parties, yet that it did not appear that he had disclosed the true extent or condition of the estate, and it did appear that he had hidden away a portion thereof by having the Waldrop land, which he had purchased in part out of the trust funds, conveyed to his wife; this, with the gross inadequacy between the trust estate and the $5,000 paid to the parties, in his opinion, was suffi-

cient to warrant the setting aside of the deed as to Leaman, the trustee, and that an accounting be had, which he recommended— in the accounting Leaman to have credit for the $5,000 paid, and for any other loss which he may have sustained in compromising and settling notes, &c., due the trust estate, under the impression that he owned them individually after the assignment and transfer above.    But he recommended, as to the sureties on Leaman's trust bond, that the deed should stand, operating as complete discharge to them.    This report was confirmed by his honor, Judge Wallace, and from his decree this appeal is before us, the plaintiffs contesting it, because the sureties were held discharged, and the defendant, Leaman, contesting it, because said deed was not held valid as to him.

Taking up Leaman's appeal first.    There can be no doubt as to the principles of law and equity governing in these matters of settlement between trustee and *cestui que trust*, and as to the conduct required of the trustee in the management of the trust estate.    These principles have been fully and correctly stated in the argument on both sides, and therefore they need no elaboration here.    Without referring to authorities or decided cases, of which the books are full, we may say, in brief, that the utmost good faith is required; there must be no *suggestio falsi* or *suppressio veri*.    There must be no profit made to the trustee in the management of the estate, and all settlements between them must be fairly made, with no concealment, undue influence, or misleading.    But at the same time, if the parties are of full age, *sui juris*, and capable of understanding their rights, with full opportunity of ascertaining them, under no disability, advised as to all the circumstances surrounding the matter, or in a situation, by reasonable and proper diligence, to be thus advised, and they proceed, they must abide the result; and should their action subsequently result in loss, there is no reason, as is said in *Murrel* v. *Murrel*, 2 Strob. Eq., 148, "why the Court of Equity, or any other, should be called to protect them from the consequences of their folly."    *McDow* v. *Brown*, 2 S. C., 95; *Bossard* v. *White*, 9 Rich. Eq., 496.

. Now, the law being plain, the question here as to Leaman is mainly a question of fact.    The referee found, as matter of fact,

that there was enough in the conduct of the trustee, in connection with the execution of the deed in question, to demand that it be vacated, and his honor, the Circuit Judge, has confirmed this finding. So that the question of reversal or affirmance of this much of the decree comes before us under the rule often referred to and acted upon, not only by our court, but by all of the courts where justice and law are properly administered, to wit, such findings must be affirmed and taken as established facts in the case, unless they are clearly without any testimony to support them, or are obviously in conflict with the preponderance of said testimony.

We have examined the testimony reported by the referee, with the rule above as our guide, and while we find some testimony to support the finding of the referee, in so far as the plaintiffs, Emma Nance and Mary E. Bryson, are concerned, we do not find any to sustain the finding as to E. F. Waldrop. It seems to us that Waldrop was the prime mover in this whole matter. He sought Leaman and proposed to sell. He took advice from an attorney, and through him examined the records, Leaman's return, &c., and no doubt had full information as to the amount of the estate and of the solvent character of Leaman's bond, and he persisted in having the settlement made. That he was in need of money was not Leaman's fault, nor is there the slightest evidence that Leaman took advantage of his impecuniosity. He was of full age and intelligent, and made this contract with his eyes open. Under these circumstances, even assuming that it was a foolish one on his part, "there is no reason why this court, or any other, should be called upon to protect him from the consequences of his own folly."

As to the inadequacy of the consideration. It is true, that in the light of subsequent events this looks striking, but is that the way to consider this matter? Ought not the facts that these plaintiffs had no interest until the death of Robert Workman, jr., and that it depended upon their surviving him whether their interest would be realized—that Robert was stout and robust, and it was not at all certain but that he might out-live them, or some of them, and that Leaman was taking this risk, with the danger of losing all that he had—be considered? What would have

been the market value of plaintiffs' interests, if put up for sale, thus surrounded? And ought not the inadequacy be looked at from that standpoint? See 3 *Am. & Eng. Ency. Law,* 40.

So much of the decree as sustains the deed, as a discharge of the defendants' sureties on Leaman's bond, we think, must be affirmed. The settlement between the trustee and those other parties was no doubt known. It was placed on record, and the sureties were well warranted in supposing that it was final; they were lulled into a feeling of security, and having no sense of danger, were prevented from even considering the propriety of taking any steps for their protection, which we think was sufficient. See *Kirby* v. *Taylor,* 6 Johns. Ch., 242; *Aaron* v. *Mendel,* 78 Ky., 427, cited by the referee; *Brandt on Sur.,* sec. 211; *Rosborough* v. *McAliley,* 10 S. C., 245; and *Motes* v. *Madden,* 14 S. C., 488. Our conclusion leads to the result, that the judgment below should be affirmed as to the plaintiffs, Emma Nance and husband, William D. Nance, and as to Mary E. Bryson and husband, J. H. Bryson, and as to the defendants, William Leaman, James W. Watts, as executor of John D. Williams, deceased, and the devisees and legatees of said Williams; but that it be reversed as to E. F. Waldrop, the deed in question standing good as to him. And that an accounting should be had *de novo,* the trustee being entitled to a credit of the $5,000 paid out by him under the settlement to the successful parties and also to the liberal suggestion made by the referee in regard to any compromises or collections made by him of the notes, &c., due the estate since the execution of the deed.

The other questions raised in the appeal, it seems to us, need not now be considered, in view of the conclusion reached on the question above.

I think that the judgment of the Circuit Court should be affirmed, except so far as E. F. Waldrop is concerned, and that as to him it should be reversed, and that the case be remanded for such further proceeding as may be necessary to carry out the views herein above announced. My brethren, however, do not concur as to Waldrop. They are of opinion that the judgment below should be affirmed as a whole, and in accordance therewith,

29—30

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE MCIVER. I concur in the conclusions reached by the Chief Justice, except that reversing so much of the judgment below as is in favor of the plaintiff, E. F. Waldrop. I regard the transaction between the trustee, Samuel Leaman, and the remaindermen, after the termination of the life estate of Robert Workman, jr., as a sale of their interest to the trustee; and the rule, as I understand it, is, that to sustain such a transaction the trustee is bound to make the fullest and fairest disclosure of the nature and amount of the trust estate. Now, although it cannot be doubted that E. F. Waldrop consulted competent counsel and obtained from him full information, *so far as the records would show*, it does not appear that his counsel either had or could have obtained any information as to the investment of a large amount of the trust funds in the tract of land which Leaman bought and took titles in the name of his wife, three-fourths of the purchase money having been paid out of the trust funds. On the contrary, Leaman, in his own testimony, says that he did not inform the parties of this investment of fifteen hundred dollars of the trust funds. This, it seems to me, to say nothing of the other circumstances of the case, was a clear *suppressio veri*. But as the special master, in his full and clear report, has so satisfactorily vindicated his conclusions, it would be a work of supererogation to attempt to add anything to what is there so well said. I think the judgment of the Circuit Court should be affirmed.

MR. JUSTICE MCGOWAN. I concur with Mr. Justice McIver.