Argued March 8, affirmed May 2, 1978

PIONEER TITLE CO. OF LANE COUNTY,
*Appellant,*
*v.*
HOUSING ASSOCIATES, INC. et al, *Defendants,*
SHANKLE et al, *Respondents.*
(TC 74-0249, SC 25227)

578 P2d 1219

Kaye C. Robinette, of Robinette & Cleveland, Eugene, and Walter H. Grebe, of Anderson, Hall, Lowthian, Gross, Grebe & Jensen, Portland, argued the cause and filed the briefs for appellant.

Clayton C. Patrick, Salem, argued the cause for respondent Reiswig. With him on the brief were Roy Dwyer and Roy Dwyer, P.C., Eugene.

Richard D. Curtis, of Curtis, Hendershott, Strickland & Hudson, Eugene, argued the cause and filed the brief for respondents Shankle and Shrode.

Before Denecke, Chief Justice, and Tongue and Bryson, Justices, and Joseph, Justice Pro Tempore.

TONGUE, J.

## TONGUE, J.

This is an action by the assignee of a bank to enforce written guaranty agreements for payment of debts owed by defendant Housing Associates, Inc., for which payment was credited to that corporation by the bank by mistake. The case was tried to the court, without a jury. Plaintiff appeals from a judgment in favor of defendants, based upon a general finding "for the defendants and against plaintiff."

Because we must affirm that judgment if there is any evidence to support it, we must review the entire record, including an almost incredible series of mistakes by the Bank of California, the Pacific Continental Bank (the original plaintiff—"the bank"), and Pioneer Title Co. of Lane County (its assignee and the present plaintiff). In doing so, we must state the facts in the light most favorable to the defendants, who are also entitled to the benefit of all favorable inferences from such facts.[1]

*Summary of the facts.*

■ *The original parties.*

Pacific Continental Bank, the original plaintiff in this case, was organized in 1972. Its place of business was a trailer house in Eugene.

Defendant Housing Associates, Inc., was a corporation engaged in the construction of houses in Eugene and was apparently organized about the same time. There was evidence that it was a nonprofit corporation "to help low income and underprivileged to get housing and jobs." Its directors included defendant Arthur Shankle, a minister with experience as a contractor in building houses. Defendant Reiswig, also a director, was manager of the corporation until January 1973, when he resigned. Defendant Shrode, also a director, built the first houses for the corporation as a contractor.

---

[1] *See Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966).

[ 217 ]

■ *The signing of the guaranties.*

(a) *The $5,000 guaranties.*

On August 21, 1972, defendants Shankle, Reiswig and Shrode each signed a "guaranty" by which they promised to pay to the bank "any and all indebtedness of the corporation," in an amount "not to exceed at any one time" the "principal amount set forth above," which was stated to be $5,000. Defendants Shankle, Shrode and Reiswig admit by their answers in this case that those guaranty agreements were signed by them, but "with the express understanding and agreement that said guaranties went to cover a single amount of $5,000 only." They also testified that the purpose of those guaranties was to enable the corporation to borrow money at the bank for operating capital for the construction of houses.

(b) *The subsequent "unlimited and continuing" guaranties.*

Defendants Shankle, Shrode and Reiswig each also signed a subsequent guaranty which, according to its terms, was "unlimited and continuing." They denied, however, that those words were on those documents when signed by them. As for the purpose of those guaranties, Rev. Shankle testified to his understanding that "someone" needed a copy of the original guaranty. Mr. Shrode testified to the understanding that it was "probably for a continuing of the first $5,000." Mr. Reiswig testified to the understanding that its purpose was to "secure" a $3,000 contractor's bond needed by the corporation.

The president of the bank at that time, Mr. Machen, admitted that it was "entirely possible" that the words "unlimited and continuing" were "filled in" after the documents had been signed and after their return to the bank. Indeed, it appears to be clear, as he also testified, that those words (as well as the date of those guaranties) were typed on a different typewriter. He also admitted that neither he nor anyone at the bank

contacted defendants to obtain their permission to insert those words.

■ *The mistaken credit and payment by the bank of $53,125 to the corporation.*

On August 14, 1973, the bank received from The Bank of California a "slip" showing a "credit" to "Pacific Continental Bank, a/c H/A of Lane County, Oregon," for $53,125, with the notation "Purchase of Housing Authority of Portland, Oregon, Project Notes." That credit was intended to be for the benefit of Housing Authority of Lane County, which had an account at another Eugene bank, but no account at this bank. The bank, however, mistakenly assumed that the credit was intended to be for the benefit of defendant Housing Associates, Inc.

At that time, the bank's "liability ledger" for Housing Associates, Inc., showed a balance due in the sum of $38,970.08. This included three promissory notes dated May 1 and May 13, 1973, and also a fourth note. A total of $40,063.14 in principal and interest was then due on those four notes, which were then marked "paid," with notation that as of August 14, 1973, the balance due on each note was "0." The notes were then returned to Housing Associates, Inc., with a letter dated August 16, 1973, enclosing those notes as "paid in full August 14, 1973."[2] Some of those notes were not yet due. In addition, a cashier's check dated August 14, 1973, in the sum of $12,773.30 was delivered to that corporation with the notation "balance of $53,125.00 from Bk of Cal." The person who handled those transactions for the bank was not called as a witness and was no longer employed by it.

■ *Discovery of the mistake and other subsequent events.*

No testimony was offered by plaintiff as to when this mistake was discovered by the bank, much less

---

[2] A note from R. Creal with balance due of $288.56 was also returned as "paid in full."

when it first took any steps to correct that mistake by seeking to rescind its cancellation of the notes and by seeking to recover the $12,773.30 paid by it to Housing Associates, Inc. The president of the bank since December 1973 testified that the mistake had been discovered when he arrived in late December.

Meanwhile, on August 20, 1973, Rev. Shankle wrote to the bank as follows:

"Some time ago I sign for Housing Associates Inc. to borrow five Thousand Dollars ($5,000.00) from this bank.

"After checking with the bank I found a form bearing my signature to authorizing Housing Associates Inc. to borrow an unlimited amount of money, which I didn't authorized, as of Aug. 20, 73 please withdraw my signature from your file.

"Before any money are disburse to Housing Associate Inc. please notify me."

Rev. Shankle also testified, in response to questions asking when he learned that the bank had paid off the notes or advanced funds to the corporation, that on the same date when he took to the bank his letter dated August 20, 1973, he had received a call from a "Mr. Sever" (Severson) at the bank, who "asked me would I work with him and help him to recover that money"; that he then talked with some of the directors of the corporation, who authorized him to "pick up" two checks when the sale of a house was closed, one for $15,000 and one for "a little over" $2,000, and deliver them to the bank; that when he did so, however, he was told by Mr. Severson, "Well, you don't have to worry about that now because the deal is all cleared up."

Rev. Shankle also testified that he then returned these two checks to a Mr. Crow of Commerce Mortgage (which apparently had issued them) and that "to my knowledge, he turned them over to Mr. Creal and Mr. Welch" (who were then apparently running the affairs of the corporation).

According to the testimony of Mr. York, who became president of the bank in December 1973, Mr. Severson was his predecessor and was the person who made the investigation of this matter on behalf of the bank. Mr. Severson, who lived in Portland, was not called as a witness.

Mr. York also testified that some of the bank loans to the corporation were secured by trust deeds which were also released by the bank and which, if foreclosed, would have reduced the amount of the indebtedness. A successful suit was filed in December 1973 to reinstate and foreclose one of the trust deeds, which secured one of the notes, resulting on July 26, 1976, in a decree of foreclosure and a judgment for $16,500, plus interest.

No definite evidence was offered to show what assets the corporation may have had as of August 14, 1973, or the disposition of any such assets after that date, although there was evidence of some disbursements by it after that date.

The original complaint in this case was not filed by the bank until January 14, 1974. In that complaint it was alleged by the bank (the original plaintiff), that the credits and payments made by it on August 14, 1973, for the benefit of the corporation (which was named as a defendant) were made "by mutual mistake of the plaintiff and defendants, or by mistake of the defendant Bank of California and of plaintiff which was induced by and known to the defendant, Housing Associates, Inc." On trial, however, Mr. York, president of the bank, testified that there was nothing to indicate that those individual defendants (the guarantors) did anything to induce that mistake by the bank.

At some undisclosed date subsequent to the filing by the bank of that original complaint defendant Housing Associates, Inc., went into bankruptcy and on May 14, 1976, its trustees moved to intervene in this case. A claim in bankruptcy for $62,923.22 was then

[ 221 ]

filed by the bank on or about June 9, 1975. On July 28, 1976, on motion by plaintiff bank, a judgment of nonsuit was entered in favor of defendant Housing Associates, Inc.

Also subsequent to the filing of the original complaint the Bank of California, which had also been named as a defendant, made a settlement with plaintiff bank on May 27, 1975, under which plaintiff bank paid $27,783 to that bank in return for a release and a nonsuit was also entered in favor of that bank.

Finally, on October 1, 1976, also subsequent to the filing of the original complaint, the plaintiff bank, in return for $25,000, assigned its rights under the foreclosure decree to Pioneer Title Co. of Lane County, which was then substituted as the plaintiff in this case. That title company, also by mistake, had insured as free and clear the title to the purchaser from Housing Associates, Inc., of property subject to the suit to reinstate and foreclose the trust deed on that property, despite the fact that it was aware of the fact that the bank had filed a notice of intent to claim a mistake in canceling the trust deed. The debt owed to the bank by Housing Associates, Inc., however, was not reduced by the bank as a result of the $25,000 payable to it in return for that assignment. This, according to the title company, was because, in order to protect its insured purchaser, the title company does not intend to enforce the decree of foreclosure. Under its assignment from the bank, however, the title company now seeks to recoup its loss from the three individual guarantors, who remain as the defendants in this case.

*The judgment was supported by the evidence.*

Plaintiff's sole assignment of error is as follows:

"The court erred in holding that plaintiff was not entitled to recover from the appearing defendants any of the amounts owed to plaintiff's assignor by Housing Associates, Inc."

[ 222 ]

As plaintiff concedes, the only issue raised by such an assignment of error is whether the trial court was required, as a matter of law, to decide the case in its favor. *Baker Prod. Credit v. Long Cr. Meat,* 266 Or 643, 651, 513 P2d 1129 (1973). We hold that it was not.

We cannot properly hold that there was no evidence to support the trial court's decision. The evidence is clear that on August 16, 1973, the bank, having erroneously credited funds it had received in full satisfaction of the corporation's debt, returned to the corporation its notes, marked "paid." It also released the trust deed which it had taken as security for the balance due. Thus, the trial court could have properly found that at a time when the corporation was apparently in some financial difficulty the bank, solely because of its own mistake, significantly reduced the likelihood that the corporation would make any effort to pay its debt to the bank and unwittingly created an additional debt by sending the cashier's check for $12,773.30 to the corporation.

Although the evidence is somewhat equivocal, the trial court also could have properly found that the bank was aware of the error as early as August 20, 1973, when, according to the testimony of Rev. Shankle, the president of the bank, Mr. Severson, called him and asked him for his help "to recover that money." Mr. Severson, who made some investigation of the matter prior to the arrival of his successor in December, was not called as a witness, as previously noted, although he lived in Portland. There was no evidence of further steps taken by the bank to correct the error until the complaint was filed in this case on January 4, 1974. By that time, according to the bank's allegations in the original complaint, the corporation was financially unable to pay the debt.

The trial court could also have properly found that between August 20, 1973, and the filing of this action the following January, the corporation had available at least some funds which could have been applied to

the debt were it not for the bank's mistaken release of the corporation and its security. In fact, as Rev. Shankle testified, shortly after August 20 the bank refused a payment from the corporation in excess of $17,000, telling him that the matter was "all cleared up."

Upon this evidence we think the trial court could have properly found that the bank did not, when it learned of its mistake, act promptly to rescind the mistaken release and that, as a consequence, the position of the defendants as sureties was adversely affected.

As a general rule, a release of the principal debtor by a creditor discharges a surety. The reason for this general rule has been stated in Simpson on Suretyship 300 (1950), to be:

> "\* \* \* that payment by the surety after the creditor has voluntarily released the principal was not contemplated. When a surety contracts, he does so for the purpose of protecting the creditor from loss or inconvenience caused by the principal's nonperformance, but the nonperformance contemplated is one that is not caused or encouraged by the creditor himself. *It could not have been contemplated that the surety should make good a debt that all parties originally expected the principal to pay when the creditor, by giving him a release, causes him not to pay.*" (Emphasis added)

Even where the release is voidable by the creditor because it was procured from the creditor by fraud or misrepresentation on the part of the principal debtor, undue delay on the part of the creditor in rescinding the voidable release has been held to result in the discharge of the surety. *Kirby v. Landis,* 54 Iowa 150, 6 NW 173 (1880); *Reints & DeBuhr v. Uhlenhopp,* 149 Iowa 284, 128 NW 400, 402-03 (1910); *Waldrop v. Leaman,* 30 SC 428, 9 SE 466 (1889). *But see Hier v. Harpster,* 76 Kan 1, 90 P 817 (1907). The Restatement of Security § 123 (1941), would limit the surety's discharge in such a case to the extent of his actual

prejudice, but only if the creditor "seasonably" rescinds the release.[3]

Simpson, *supra* at 307, explains the justification for discharging the surety when the creditor innocently, but mistakenly, releases a fraudulent principal debtor as follows:

> "* * * Since such release is the voluntary act of the creditor, and since it must have the effect of causing the principal not to perform, it is reasonable that the surety should be discharged. * * *"

We see no reason why the same rule should not apply when the release has been given solely because of the creditor's mistake.

It is true that in the cases cited the surety's discharge was justified, at least in part, on the basis that he knew of the release and relied on it in failing to take steps to protect his position. In the present case there is no such evidence of detrimental reliance. There was, however, as we have pointed out, evidence from which the trial court could find that while the bank delayed in taking steps to rescind the release of the corporation, the corporation's financial position was deteriorating; that the bank's security for the debt had been released; and that those assets which the corporation had were being applied elsewhere.

Based on such evidence, the trial court could have properly found that the bank's mistaken release of the corporation and its failure to act promptly to rescind the release resulted in prejudice to the defendant sureties by exposing them to potential liability for nonperformance by the corporation which was caused or encouraged by the bank. As pointed out in the above quotation from Simpson on Suretyship (at 300), this is

---

[3]Restatement of Security § 123 (1941), states the rule as follows:

"Where, induced by fraud or duress on the part of the principal, the creditor releases the principal but seasonably rescinds the release, the surety's obligation is discharged only to the extent that he has been prejudiced."

not the kind of liability which the parties to a suretyship agreement contemplate.

Plaintiff, in support of its position that the defendants remained liable as sureties under the circumstances of this case, relies on provisions of the guaranty agreements which define "indebtedness" very broadly[4] and consent in advance to dealings between the bank and the corporation.[5] These provisions do indeed give the bank broad authority to deal with the corporation without affecting the guarantors' liability. They do not, however, authorize the bank to release the corporation completely and still hold the guarantors liable.

As previously noted, the rule that a release of the principal debtor also releases the surety is founded on assumptions about the parties' intentions which are derived from the nature of the relationship itself. At least with respect to uncompensated sureties, such as

---

[4]The guaranty agreements include the following provision:

"2. 'Indebtedness' defined. The word 'indebtedness' is used herein in its most comprehensive sense and includes, but is not limited to, any and all advances, debts, obligations, and liabilities of Borrower, or any one or more of them, including judgments against Borrower, heretofore, now or hereafter made, incurred, or created, whether voluntarily or involuntarily and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or primarily or secondarily, and whether recovery upon such indebtedness may be or hereafter may become barred by any statute of limitations, and whether such indebtedness may be or hereafter may become otherwise unenforceable."

[5]Paragraph 4 of the guaranty agreements provide in part:

"Guarantor authorizes Bank to deal with Borrower * * * in any manner in which Bank sees fit in connection with any indebtedness of Borrower to Bank, now or hereafter created, without any further consent or authorization from Guarantor being necessary. Specifically, but without limiting the powers of Bank, Bank may * * * extend the time for payment of any indebtedness of Borrower; Bank may release any collateral given to Bank by Borrower, with or without the substitution of new collateral; Bank may * * * sue or fail to sue Borrower upon any overdue indebtedness or may realize or neglect to realize upon any collateral held in connection therewith; all of the foregoing without the necessity of any consent from Guarantor and all without affecting Guarantor's liability hereunder."

these defendants, we are not willing to hold that the parties have agreed to the contrary without a clear expression of their intention to do so. Although the guaranty agreements define indebtedness to include debts which have become unenforceable, and although they authorize the bank to release any collateral, they do not directly express an intention that the bank be free to release the corporation from its obligations and still look to the guarantors for payment. In the absence of a clear expression of such an intent, we will not so construe these agreements.

In summary, then, the trial court, as the finder of the facts, could have found that the bank released the corporation from its obligations without authority in the agreement to do so, and that when it discovered that the release had been given by mistake, it delayed unreasonably, to defendants' prejudice, in taking steps to rescind the release.[6]

Because, as a result, there was evidence to support the judgment of the trial court, that judgment must be affirmed.[7]

---

[6]This holding is not in conflict with our recent decision in *Progress Quarries, Inc. v. Lewis,* 281 Or 441, 575 P2d 158 (1978). In that case, as part of a transaction involving an assignment of a security agreement, the assignor bank made a notation on certain notes that the balance due was zero. The original guarantor of the obligations represented by those notes, when sued by the assignee of the security agreement, contended that the notes had been paid and that he had been discharged as surety. The trial court held that the notes had not been paid; that the zero balance notations were made by mistake; and that the guarantor remained liable on his guaranty agreement. In that case, as here, our task was to determine whether there was any evidence to support the trial court's findings. As in this case we held, despite some evidence to the contrary, that there was. In that case there was evidence that none of the parties to the assignment transaction had intended at any time that the notes be retired. Moreover, unlike the situation in this case, the notes were neither marked "paid" nor returned to the maker. Also, the issue of prejudice to the surety caused by a release of the principal debtor did not arise.

[7]Because of the basis on which we decide this case we need not consider other questions raised by defendants' affirmative defenses.