Argued December 7, affirmed December 30, 1966

# CRONN v. FISHER

422 P. 2d 276

*Glenn R. Jack,* Oregon City, argued the cause for the appellant. On the briefs were Jack, Goodwin & Anicker, and Ashley Greene, Oregon City.

*George L. Hibbard,* Oregon City, argued the cause

for the respondent. On the brief were Hibbard, Jacobs, Caldwell & Kincart, and Paul D. Schultz, Oregon City.

Before McAllister, Chief Justice, and Perry, O'Connell, Denecke and Redding, Justices.

REDDING, J. (Pro Tempore).

Defendant Dagmar S. Fisher, executrix of the estate of Bardi G. Skulason, deceased, appeals from a judgment of the Circuit Court for Clackamas County awarding plaintiff a recovery for nursing services allegedly rendered the decedent and for which plaintiff claims she was not compensated. Plaintiff in her complaint asserts two causes of action, the first upon an express contract and the second upon an implied promise to pay, each seeking reimbursement for services rendered over the six-year period immediately preceding the decedent's death. The trial court found there was not an express contract but entered judgment for plaintiff on plaintiff's second cause of action based upon implied contract. Both parties waived a jury and stipulated to try the matter before the court.

The decedent, Bardi J. Skulason, was an able and distinguished member of the Oregon bar, who practiced in Portland for many years. Indeed, although he lived to be 92 years of age, he continued in the practice until less than six months before his death in December, 1964. He left surviving him one daughter, the executrix herein.

The plaintiff, 25 years the decedent's junior, was a trained medical technician having spent virtually her entire adult life in the employ of various doctors and hospitals.

Plaintiff became acquainted with decedent's son, Ralph, in 1933 through her sister who met Ralph while

he was hospitalized for alcoholism. Ralph and plaintiff's sister became good friends. Concerning Ralph, plaintiff testified: "* * * my sister was very fond of him and felt very sorry for him, and he started coming to our home." Plaintiff herself first met the decedent when on Thanksgiving Day, 1937, Ralph, who had been invited to dinner at the home of plaintiff, her sister and mother, brought his father, the decedent, with him. Decedent was separated from his wife and was unhappy with surroundings at the University Club where he resided, and because thereof, came to live with plaintiff and her mother in the spring of 1938. In this connection, plaintiff, speaking of the decedent, testified as follows:

"Well, in the spring of '38, he was living at the University Club, and he missed his yard and garden very much and was, said he was practically dying from not being out because he loved the outdoors, and, so, on May the 20th he came to live at my summer home."

Decedent would have dinner at the home of plaintiff and her mother in Portland each evening, then drive to plaintiff's mountain cabin near Sandy where he would spend the night, returning to the Portland home of plaintiff and her mother for breakfast the next morning. This continued from May, 1938 until it became uncomfortably cold at the mountain cabin in October of the same year, when he moved into the Portland home of plaintiff's mother, with whom plaintiff and her husband were living. Plaintiff's husband was in ill health and succumbed in February, 1939. Plaintiff's mother passed away in 1946. Decedent continued to live with plaintiff and her mother until September, 1941 when decedent's daughter and her family returned to Portland from the Hawaiian Islands

where they had lived for many years. Mrs. Fisher, the daughter, and executrix herein, and her family took up residence in decedent's home in Milwaukie in September, 1941, whereupon decedent moved in with the daughter. Thereafter, except for five or six weeks following recovery from a coronary attack in 1954 and except for approximately two months during his last illness, decedent spent every weekend with plaintiff at her home in Portland in the winter and at her cabin during the summer, with occasional winter trips to the cabin. Decedent usually spent holidays with his family but was always with plaintiff on New Year's Day.

In August, 1954 decedent suffered a serious coronary occlusion and after five days in the hospital, at decedent's insistence, he was taken by ambulance to stay at plaintiff's home, where he spent six weeks recuperating. Plaintiff, in caring for decedent, was on duty 24 hours per day. This care included the care ordinarily administered by a registered nurse, such as administering medication, hypodermic shots, checking blood pressure, feeding and bathing the decedent. During this period, decedent contributed $20 a week for the purchase of groceries, and on October 6, two days after leaving her home, decedent telephoned plaintiff advising her that he had executed a will and therein had made provision for her by way of payment for the care she had given him for the six weeks' service she had rendered. This is confirmed by decedent's will, admitted to probate, in which plaintiff is bequeathed $1,000.

Plaintiff claims that from September, 1941 until the summer of 1964 ordinarly she would pick the decedent up at his office Friday evening, take him to her Portland home, returning him to his office Monday morning after breakfast. During the summer months,

she would take the decedent to her mountain cabin Saturday morning, returning decedent to his office Monday morning after breakfast. On the occasions when she did not pick the decedent up at his office Friday evening, she would ordinarily pick him up at his home on Saturday morning. Plaintiff's claim is for general nursing services, and because of the statute of limitations, her claim is limited to the six-year period beginning February 20, 1959.

Plaintiff's total claim was for $10,171 consisting of the following charges per year: $1,287 in 1959; $1,574 in 1960; $2,194.50 in 1961; $1,518 in 1962; $1,452 in 1963; $2,475.50 in 1964. The trial court allowed plaintiff $4,670 and after some off-sets, entered a judgment in her favor for $4,334.

Each week during the entire period from September, 1941, to July, 1964, when decedent would spend the weekend with plaintiff, he would give her $20 plus any moneys plaintiff might have expended in decedent's behalf, such as for medicines which plaintiff was able to purchase at wholesale. It might here be observed that plaintiff gave decedent a weekly injection of Vitamin B-12. Plaintiff maintains that these $20 payments were on account of groceries. Computations made from the decedent's check stubs would indicate that the weekly payments made to the plaintiff during the period in question totaled $1,184.82 in 1959; $1,044 in 1960; $1,601.44 in 1961; $2,555.53 in 1962; $1,761.21 in 1963; and $1,192.40 in 1964. In addition, decedent ordinarily made gifts of from $25 to $50 to the plaintiff on her birthday and gifts ordinarily of from $50 to $100 on Christmas. On one occasion, decedent represented plaintiff in a lawsuit which did not go to trial and for which he made no charge. Decedent also paid the real property taxes on plaintiff's cabin in amounts

from $65.74 in 1958 to $70.82 in 1962, and $134.83 in 1963. Decedent also made total expenditures in excess of $1,500 involving repairs and improvements to plaintiff's cabin.

■ Counsel for defendant contend that the plaintiff's relationship with the decedent over the years was purely social, one of host and guest, rather than one of employment. A careful study of the record, as will appear from the following brief review thereof, supports the trial judge's finding that the plaintiff, at the request of decedent, performed services for the decedent in the nature of practical nursing and domestic and general care during 1959 to 1964, inclusive, at various times and for various periods of time, both at plaintiff's home and cabin and at the decedent's home.

Following decedent's recovery from his coronary attack in 1954, he did not stay at plaintiff's home for a month or six weeks. According to plaintiff, he then requested that he be permitted to return on weekends. In this connection plaintiff testified as follows:

"* * * with the exception in 1954, after he left my house. As I said, I was extremely tired, and I think there was, maybe, a month or six weeks in '54 that he did not come, and he started missing his B-12 shots and he called me then and wanted to know if he couldn't come back to my house on the weekends and resume his B-12 shots."

Plaintiff's claim is limited to the six-year period beginning in February, 1959. The decedent in 1959 was 86 years of age and while he was mentally alert and able to carry on the practice of law, he was, nevertheless, to some extent and in some respects dependent on others. He required weekly shots of Vitamin B-12; he had to be chauffeured to his office and from place to place for he had not driven a car for nearly 20

years; at the close of each working day he was extremely tired and longed for quiet and for the out-of-doors. This is revealed by the testimony of the plaintiff hereinabove referred to. The plaintiff further testified:

"A Well, first, about twelve years ago I told Mr. Skulason I was going to be married, and he became very nervous and upset and developed herpes in his hair and head, and he went to San Francisco, and he called me three different times, and he said his life, to be seven days in Milwaukie, [referring to living with his daughter and her family in Milwaukie] just was just unbearable, and if I did not marry he was going to take care of me, and so he came home and I continued to take care of him. Then, in the summer of 1963, he came one weekend and he was—he just had stars in his eyes because he was so happy. He said, 'I haven't told you this, but I have an option on the farm in Salem for a hundred thousand dollars, and as soon as I get the first payment on that I am going to make things right with you.'

"Q Was this for the care that you had given him over the years?

"A Over the 27 years, yes."

It would appear from the record that there were other reasons decedent sought the services of plaintiff. It will be recalled that the decedent ordinarily made his home with his daughter Monday night through Thursday night when the daughter was at home. However, there were many occasions when the daughter was not at home, such as the two-month period in 1962 when the daughter traveled in Europe, during which the plaintiff was called upon to leave her home and live in decedent's home that she might care for the daughter's dog and lawn, as well as for her 90-year-old father; then, too, there was the occasion

in 1964 when the daughter was in Salem with her daughter who was having domestic difficulties and the care of the 92-year-old decedent fell to plaintiff over an extended period of time. Thus, there were many, many occasions other than weekends when plaintiff was called upon to care for decedent. The following excerpt from plaintiff's testimony sheds further light on decedent's reasons for desiring plaintiff's services:

"Q  Was there any—did Mr. Skulason ever give you any reason why he didn't wish his daughter to take care of him?

"A  Well, Mrs. Fisher's mother spent many, many months in a sanitarium with melancholia, and she committed suicide, and Mr. Skulason had a horrible fear that this was going to happen to his daughter, and he wanted to relieve her. He just didn't want her to get tired.

"Q  What would he tell you in this regard, what would be the words that he would use about it?

"A  Well, he would say, 'I don't want to burden Dagmar with it.' That was the common expression. He would say, 'I am afraid she might become like poor Charlotte.'

"Q  And was part of the reason of his weekends under your care, was that to relieve his daughter of the responsibility in her own home?

"A  I am quite sure it was."

■■  On appeal from a judgment allowing a claim against a decedent's estate, the findings of the trial court stand in the same position as a jury's verdict and must be affirmed if there is any competent, substantial evidence in the record supporting them. The case of *Wagner v. Savage, as Adm'r.,* 195 Or 128, 244 P2d 161 (1952), like the case at bar, was an action on the theory of an implied contract to recover the reasonable value of personal services. That case, too, was tried

before the court without a jury on stipulation of the parties and a judgment was entered in favor of the plaintiff and the defendant appealed. The following language from the court's opinion in that case is applicable here:

"This being a law action, the findings of the trial court upon the facts have all the force and effect of a verdict of a jury, and this court is bound thereby if there is any substantial evidence in the record to support them. We are not permitted to weigh the evidence and arrive at our own independent conclusions respecting the facts, as is the case in equity proceedings which are here tried de novo. * * *" (195 Or at 141)

■ This court on appeal must view the evidence in the light most favorable to plaintiff and if, in the entire record, there is any competent evidence to support the findings of the trial court, the judgment must be affirmed. See *In re Swank's Estate,* 163 Or 367, 97 P2d 723 (1940); *Hiller v. Smith,* 171 Or 428, 137 P2d 828 (1943); *Richter v. Derby,* 135 Or 400, 295 P 457 (1931); *Jacobson v. Holt,* 121 Or 462, 255 P 901 (1927).

■ An implied contract to pay the reasonable value for services rendered arises from the acceptance of beneficial labor from one not a member of the recipient's family unless a contrary situation is exhibited. *In Estate of McLain,* 126 Or 456, 459, 270 P 534 (1928) this court held:

"The general rule is that where one person at the request of another performs beneficial services for him, unless it is agreed or it can be so inferred from the circumstances that the services were to be rendered without compensation, the law, in the absence of any express contract, will imply a promise on the part of him for whom the services were rendered to pay for them what they were reasonably worth."

See also *McKee v. Capitol Dairies,* 164 Or 1, 6, 99 P2d 1013 (1940); *In re Swank's Estate,* supra (163 Or at 371); *Richter v. Derby,* supra (135 Or at 407); *Jacobson v. Holt,* supra (121 Or at 468).

In *Ingram v. Basye,* 67 Or 257, 135 P 883 (1913) plaintiff sought to recover a judgment from defendants for the value of her services rendered to them on the theory of implied contract. The evidence showed that plaintiff was taken into the home of defendants as an infant and from the age of 14 through the age of 36 she was ill-treated and made to work long hours. On appeal, this court held that the facts presented a question for the jury and that it had been error for the trial court to direct a verdict in favor of the defendants, stating:

> "A contract to pay is presumed from the acceptance of beneficial labor unless the relationship of the parties is such as to forbid the presumption.
> *       *       *
> "To differentiate the law as applied to relatives and the rule as affecting strangers living together as a family is to observe that no agreement for compensation will be implied as between relatives, and a contract alleged to exist must be affirmatively shown, while with respect to strangers a contract for compensation will be implied unless a contrary situation is exhibited, *the burden thereof being on the beneficiary of the services.*" (Emphasis supplied.)  67 Or at 260.

There was really no contention by the defendant during the trial of this case that plaintiff did not provide a weekend place of lodging for the decedent during the years covered by the claim and for many years prior thereto, nor was there any serious contention that the decedent was not with plaintiff at the other times stated in her claim with the possible exception

of the sixty-day period in 1964 which defendant recalled as having been a substantially shorter period of time. Actually, a good deal of plaintiff's testimony was corroborated by the defendant herself. Plaintiff presented evidence from which the court could have found that plaintiff's services consisted of acting as a chauffeur for the decedent whenever he required transportation, providing him with a quiet place to rest and relax on weekends, administering the medications that he required and in general performing the myriad of tasks that one might expect of a practical nurse. There was also evidence from which the court could have found that the decedent recognized his obligation to the plaintiff for her services and intended to compensate her therefor. Indeed, in decedent's final year, he seemed to go out of the way to discuss the matter of his obligation to plaintiff with his acquaintances.

■ Defendant questions plaintiff's right to recover if plaintiff expected to be compensated by a legacy. Defendant, in her brief, inquires: "If plaintiff performed services in expectation of a legacy, can she recover on an implied contract?" We recognize that if the evidence does not support a finding of the existence of an implied contract, plaintiff cannot recover. However, if the evidence does support a finding of an implied contract, the mere fact that the plaintiff may have expected payment to be in the form of a legacy does not bar her recovery. This court so held in the case of *In re Estate of T. A. Stoll,* 188 Or 682, 695, 214 P2d 345, 217 P2d 595 (1950). The court there said:

"* * * It has been held in a number of cases, however, that, even if there was no express contract, nevertheless, if there was an expectation of payment on the part of the person who rendered the

services, although he supposed that such compensation would be made by a provision in the will of the recipient, and if the evidence showed that the recipient recognized his obligation in the premises by stating to others that he expected to make full compensation therefor, then, on the death of the recipient without having made payment in any manner, the person who performed the services may recover by action in *quantum meruit* against the recipient's estate. * * *"

■ A rejected claim against an estate must be proved by competent, satisfactory evidence, other than the testimony of the complainant. ORS 116.555 provides:

"* * * No other claim which has been rejected by the executor or administrator shall be allowed by any court except upon some competent, satisfactory evidence other than the testimony of the claimant."

Following is a summary of the testimony of witnesses called by the plaintiff in corroboration of her claim.

Lexro Prillaman, a witness called by plaintiff, told the court that he was a high school teacher in the city of Portland and that he had known the decedent since 1938, that he was a fellow member with the decedent of the University Club and had met the decedent through his acquaintanceship with the plaintiff. Mr. Prillaman testified that he had been in the home of plaintiff and at her cabin and had seen the decedent in both places on several occasions. He said, "* * * she would take care of him, cook him a good meal and he liked it there." Shortly before the decedent passed away and the last time that the witness saw him alive, the decedent took Prillaman, whom he called the Professor, aside at the University Club one afternoon and

told him that he wanted his Salem property to go to plaintiff, saying:

"'You know, Professor, I want that piece of property to go to Blossom.' I didn't say anything. I didn't say ten words in this whole conversation. And he hesitated a minute and he said, 'You know, as well as anybody, how kind she's been to me and what she's done for me.'"

Fern Cox related that she had known plaintiff for some 12 years on a business and social basis and had seen plaintiff and decedent together on several occasions both at plaintiff's home and at her mountain cabin. Her recollections of decedent at these times were of him lying on the porch lounge with plaintiff making him comfortable by seeing that he was warm enough and bringing him whatever he desired. She recalled that decedent referred to plaintiff as his nurse.

Ruth Roots testified that she had known the plaintiff from 1957 to the present time and had begun going to plaintiff's cabin about every other week since shortly after she had met plaintiff. Decedent was at plaintiff's cabin on these visits and Mrs. Roots described him as having all the attributes of an invalid. His activities consisted mostly of just sitting. She described how plaintiff brought to decedent whatever he needed, waiting on him continually. Like Mrs. Cox, she testified that decedent referred to plaintiff as his nurse and that plaintiff did indeed act as his nurse giving him his medication and shots. Mrs. Roots described the decedent as unsteady on his feet and told of how plaintiff would assist him whenever he moved about or attempted to negotiate stairs. The witness related how a few days before his death, decedent called her and her husband to his bedside and told them

that he wanted to be sure that plaintiff was taken care of and that plaintiff was to have a share in his Salem property for her services.

Amos Bennett, a man who farmed property adjoining the plaintiff's mountain retreat, testified that he had become acquainted with plaintiff in 1958 or 1959, that thereafter he saw the decedent at plaintiff's mountain cabin approximately once a month. Mr. Bennett described decedent's condition as follows:

> "Well, he was getting around, but he was getting quite a lot of care and help from Blossom. He laid down a lot out in the shade, and he [sic] fixed a place for him to lay down."

The witness revealed that decedent had told him that he was the oldest practicing attorney in Oregon and owed it all to plaintiff for helping to keep him in a condition so that he could still practice law. Decedent also told the witness that when he was gone, plaintiff would be taken care of.

Joseph Eoff, the former husband of defendant's daughter, testified that decedent had told him that plaintiff cared for him approximately three months in 1964 during defendant's daughter's marital difficulties when the defendant was visiting her daughter in Salem.

Una Cummins, who resides across the street from plaintiff's home, testified that since 1959 she had observed decedent regularly in plaintiff's home, usually on weekends, and that during these times when she would visit, decedent was lying on the davenport and plaintiff was trying to make him comfortable waiting on him and administering to him as one would to anyone that was sick or not feeling well by placing heating pads about him and making him things he could eat.

Mrs. Cummins also testified that decedent referred to plaintiff as his nurse.

Walter Roots, the husband of Ruth Roots, testified that he had become acquainted with decedent about 1958 when he met him at plaintiff's cabin. Thereafter, he saw decedent at the cabin about twice a month until shortly before his death. During this time he witnessed plaintiff caring for decedent and testified that decedent referred to plaintiff as his nurse. Mr. Roots testified that decedent would order plaintiff about without so much as a "please" and she would do whatever he demanded and was very attentive to the state of his health. When asked if the relationship between plaintiff and decedent appeared to him to be that of host and guest, the witness answered that the only thing he could say was that decedent gave the orders and plaintiff obeyed. Mr. Roots told of how plaintiff would pick up decedent on a Friday evening and would bring him home on Sunday night or Monday morning. He related that decedent called him to his home a few days before his death and told him, among other things, that plaintiff had to be taken care of. On cross-examination the witness testified that the decedent had revealed to him that plaintiff gave the decedent a Vitamin B shot once a week.

Defendant herself testified that she could not remember whether she had ever asked plaintiff to take care of her father, that the arrangement was so old and had been going on for so long that it was something between them and they made their own arrangements. From 1941 on, decedent's arrangement with plaintiff was that he would spend the weekend with plaintiff but it wasn't always a complete weekend. Sometimes she called for him on Friday, sometimes he met her on Saturday and occasionally, when the weather was bad,

on Sunday. Defendant also testified that in decedent's final illness, plaintiff would come over and do many things for decedent and she even spent some time there. She testified that in decedent's final illness, plaintiff was paid $84 a week for her services. In addition to plaintiff's nursing services, defendant testified that plaintiff drove the decedent to meetings and other places where he was required to be. Defendant also testified that she had confidence in plaintiff's ability to give shots because she knew that plaintiff was experienced.

Henrietta Bruce, decedent's secretary of 37 years, testified that decedent wrote a check on his corporate account to plaintiff for approximately $20 nearly every week for the years 1959 through 1964, that she knew of her own knowledge that decedent spent frequent weekends with plaintiff and that plaintiff would pick him up at the office and take him to her place near Sandy. In periods of poor health, he often stayed at plaintiff's home.

In *Hiller v. Smith,* supra, the court, speaking of the requirement of corroboration, had this to say:

"The only remaining question relates to the sufficiency of the corroborating testimony. Witness Sellwood testified that the decedent stated to him that the decedent's brothers had done considerable work and would be paid and that when the bills were straightened up he intended to leave the rest of his property to the plaintiff. The plaintiff's mother testified that the decedent said to her that if Alice would come and stay with him that he would give her all 'his money and things like that' and that he 'talked about having some papers made out and he wanted I should make them out and I told him I hadn't any experience making them out, I would see Mr. Smith.' The witness told the decedent that the plaintiff could not always stay

with him, to which he replied that he 'didn't want her only when he needed her.' There is evidence that she was always in readiness every time he sent for her. The evidence of several witnesses corroborates plaintiff's testimony concerning the substantial nature of the services performed, and the testimony of plaintiff's mother supported plaintiff's claim as to the reasonable value of her services.

"If we were required to weigh the evidence in this case we would deem it advisable to review the testimony more in detail, but since our only duty is to determine the sufficiency of the claim as filed and to determine further whether there is substantial evidence sufficiently corroborated to support the claim, we think it unnecessary to encumber the record with further testimony. There was substantial evidence tending to show the plaintiff performed services of value at the request of the deceased, from which the jury was entitled to find an implied promise to pay. * * *" (171 Or at 436)

Also see *Littlepage v. Security S. & T. Co.*, 137 Or 559, 560, 3 P2d 752 (1931); *Richter v. Derby*, supra (135 Or at 403); *Estate of McLain*, supra (126 Or at 464); *Franklin v. Northrup*, 107 Or 537, 551, 215 P 494 (1923); *Branch v. Lambert*, 103 Or 423, 433, 205 P 995 (1922); 21 ALR2d 1013, 1022.

■ We hold that the corroborating testimony in the within case is sufficient to meet the requirements of the statute.

■ Defendant contends that if, indeed, plaintiff rendered decedent services, such services were paid for. Payment is an affirmative defense and must be pleaded and proved. The burden of proof is upon the executrix. *Wagner v. Savage, as Adm'r.*, supra (195 Or at 139); *In re Kries' Estate*, 182 Or 311, 315, 187 P2d

670 (1947); *Littlepage v. Security S. & T. Co.,* supra (137 Or at 560); *Estate of Kukas,* 120 Or 542, 252 P 947 (1927).

█ The executrix, her husband and her daughter quoted the decedent as having repeatedly declared that the plaintiff had been paid in full. The trier of the fact was free to reject such evidence and find that the defendant had not carried the burden of proof. We find that there is ample evidence in the record to sustain the trial court's findings.

The judgment for the plaintiff is affirmed.