Argued March 14, reversed and remanded April 11, 1974

# NORTHWEST FOUNDRY & FURNACE CO., Respondent, v. WILLAMETTE MANUFACTURING & SUPPLY CO., INC., Appellant.

521 P2d 545

*Bert E. Joachims,* Portland, argued the cause for appellant. With him on the briefs were Klosterman & Joachims, Portland.

*Carlton W. Hodges,* Portland, argued the cause for respondent. With him on the brief were Bernard, Hurley, Hodges & Kneeland, Portland.

TONGUE, J.

This is an action on an account for a balance of $4,613.27 for goods sold and delivered from November 3, 1965, to April 4, 1966, as described by eight invoices attached to the complaint. Defendant's answer alleged

both a general denial and also, as an affirmative defense, that prior to November 1, 1965, it had been agreed that the goods were to be of equal or superior quality to certain samples; that plaintiff failed to deliver goods which met that standard; that defendant gave prompt notice of that failure and its intent to reject such goods and refused to pay for them; and that "the within action is composed and made up of the items delivered to the defendant that failed to meet the foregoing standards." The answer also pleaded the statute of limitations as an affirmative defense.

The case was tried before the court, sitting without a jury. The court rejected evidence offered by defendant to the effect that, with the knowledge and approval of a representative of plaintiff, the defective "goods" included in all deliveries, beginning prior to the deliveries made under these eight invoices, were collected by defendant in barrels for return to plaintiff for credit; that upon the return of 20 barrels of these defective goods in April 1966 plaintiff refused not only to accept delivery, but never inspected them to determine whether or not they were defective, as claimed by defendant, and that the defective goods were then put in storage and eventually sold for scrap.

In rejecting that evidence the trial court sustained an objection by plaintiff that such evidence was not relevant to the issues as framed by the pleadings, which were held to be limited to the goods included in the eight invoices attached to the complaint.

The evidence relating to the defective goods was then received under an "offer of proof" including testimony that a representative of plaintiff, a Mr. Kolb,

was at defendant's plant at least once each week during the "lifetime of this contract"; that as the defective castings accumulated they were placed in barrels for return later for credit; that Mr. Kolb approved of this practice and "thought it was a 'good idea.' " Defendant also offered testimony that this arrangement was subsequently discussed also with Mr. Pindell (who was then plaintiff's president and whose mother was plaintiff's principal stockholder), and that "he thought that probably would be all right, * * * and to ship them back."

Defendant also offered testimony that after the initial deliveries (beginning in September 1965) defendant made payments from time to time, as permitted by its cash reserves, but not with reference to particular invoices; that after plaintiff's refusal to accept the tendered return of the 20 barrels of defective castings on or about April 18, 1966, defendant informed plaintiff of the amount claimed by it for defective castings; and that plaintiff then rejected that claim and demanded payment for the entire balance, including payment for these rejected items, but stated that "you will be advised as to our position on the rejected castings as quickly as possible."

Defendant then sent plaintiff a check for $5,179.58, with a letter stating that "this is the final payment we show owing you." Plaintiff acknowledged the receipt of that check, stating that "this leaves a balance of $4,054.97," and asked for "a list of the deductions you have taken." Defendant replied by a letter signed by a Mr. Caputo, its office manager, dated June 30, 1966,

stating that "the majority of deductions are credits on rejected wts" including:

| "1273 Large Wts returned at $1.80 | $ 2,291.40 |
| 276 " " " " $2.93 | 808.68 |
| 348 Small " " " $ .80 | 278.40 |

"There also was one load of over shipped Wts. These were returned on Bill of Lading No. 1168     $ 656.32"

It will be noted that these items totaled $4,034.80. Thus, defendant claimed to have paid for all "good weights" in all of the deliveries made by plaintiff, including the eight invoices in question. Plaintiff did not respond to that letter and, according to defendant, no further statements or claims were received from plaintiff.

After the offer of proof the court stated that it would allow defendant "a chance to develop further research" on the question of the relevancy of this evidence; that if the court changed its mind it would "want to have it all before me" and that if plaintiff desired to call other witnesses on the matters developed in the offer of proof "I would like to have you go ahead and put it on now." Plaintiff's counsel responded with an "OK" and then called Mr. Holmes, the president of plaintiff corporation, who testified that Mr. Kolb, as the salesman who "initiated" this purchase order, had the duty to "follow up" with defendant in the event of "any problems," so as to resolve them "immediately," but that Mr. Kolb had since died, as also had Mr. Pindell.

Mr. Holmes also testified that it was plaintiff's practice to visually inspect all castings and that "any rejected castings be returned immediately [by the customer] for resmelting"; that "this was the reason that Mr. Kolb was delegated to service this one cus-

tomer"; that defective castings could be returned for credit if that was the desire of the customer; but that any claim of such "magnitude" would have been referred to him; that Mr. Kolb and Mr. Pindell never discussed this claim with him, and that his first knowledge of it was "when these 20 barrels came back in the truck." Defendant also offered evidence that several barrels of castings had previously been returned and credited.

On cross-examination of Mr. Holmes it developed that upon rejecting the return of the 20 barrels of castings he knew where they were stored in a public warehouse, but "made no attempt to examine them."

It also developed that on June 30, 1966, plaintiff "wrote off" the amount of the deduction claimed by defendant as a bad debt for tax purposes. Since then, however, the stock of plaintiff corporation was sold by the Pindell family to another corporation and almost six years later, on March 31, 1971, plaintiff filed its complaint in this case.

In a memorandum opinion the trial court reaffirmed its ruling excluding such evidence, but stated that "My decision * * * were I to find the evidence of alleged defects should be admitted under the pleadings * * * would be in accordance with Plaintiff's Exhibit No. 9, being Mr. Caputo's figures furnished to plaintiff by defendant on June 30, 1966."

In support of its position that the trial court did not err in sustaining its objection to defendant's offer of proof relating to the defective goods, plaintiff contends that this is an "action for the purchase price of the last eight deliveries, less the amount in part payment" and that "defendant answered with a general

denial and an affirmative defense that the castings in the last eight deliveries were defective or nonconforming," with the result that "defendant was limited in his proof to the condition of the castings sued on" and was not entitled to "prove that prior deliveries contained defective castings." Plaintiff also says that "Had defendant wished to counterclaim for breach of prior transactions, it could have done so"; that "Presumably, it did not do so because of the statute of limitations"; that defendant's affirmative answer raised "the single issue of the condition of the castings sued upon" (i.e., the eight invoices), and that there was a "total failure of proof" by defendant on that issue.

We believe, however, that these contentions by defendant represent an unduly narrow position with reference to the issues raised by the pleadings in this case, at least as this case was actually tried, and a position that is difficult to reconcile with the position taken by the plaintiff on the trial of this case.

In his opening statement on trial plaintiff's attorney described the nature of this proceeding, as well as the "controversy" between the parties, as follows:

"* * * Basically, your Honor, this is an action on an account. It pertains to goods ordered by the defendant pursuant to purchase orders. The orders were filled over a period of about seven or eight months, from September of '65 through April of '66. The price of the goods ranged from 80 cents apiece to $2.93 apiece. Many thousands of them were shipped.

"The account was paid down by the defendant, to leave a balance of some $4700, for which we are now suing. * * *

"In April defendant sought to return some 2,000 of these items, representing possibly 10 or 15 per cent of the total amount he received. The basis for

his attempt to return them was they were more than he had ordered, and/or they were defective, or both. The offer was rejected by the plaintiff, whereupon defendant stored these items and ultimately sold them. Then apparently there were some discussions and negotiations about resolving this whole controversy. It was never resolved. Ultimately the instant suit was instituted."

No reference was made in plaintiff's opening statement to the "last eight deliveries," much less to this proceeding as an "action for the purchase price of the last eight deliveries." The first exhibit offered by plaintiff was its general ledger sheet, showing a balance of $4,615.27 (the amount sued for) as of June 30, 1967. Over 100 invoices, representing all of the deliveries as recorded in the ledger, including the eight invoices in question, were then offered in evidence. The manner of posting entries in the ledger was explained and there was testimony that the last payment of $5,179.58 by defendant was received on June 24, 1966; that all but $157.61 of that payment was applied to charges incurred prior to "the eight most recent invoices," which totaled $4,770.88; and that this left a balance of $4,613.27. Based upon this testimony plaintiff then rested.

Upon examination of the ledger and invoices it appears, among other things, that one of the eight invoices in question, for $645.60, was dated November 3, 1965, and that there were many further deliveries between that date and the dates of the remaining seven invoices. Thus, the eight invoices in question were not what plaintiff refers to as "the eight last deliveries." It is also to be noted that all but two of the eight invoices were dated prior to March 31, 1966, more than six years prior to the filing of this action.

■ These facts may or may not explain why plaintiff's complaint alleges that "defendant is indebted to plaintiff in the sum of $4,770.58 for the *balance* of an account for various items of personal property sold to defendant between the dates November 3, 1965, and April 4, 1966," although adding the allegation, as "were particularly described" in the eight attached invoices. Indeed, ORS 16.470, relating to "pleading account," expressly provides that "A party may set forth in pleading the items in an account therein allowed, * * *." The attachment of the eight invoices, however, did not convert this action on an account into what plaintiff now refers to as "an action for the purchase price of the eight last deliveries."①

The net effect of the evidence included in defendant's "offer of proof" was that there was an agreement between the parties under which defective goods were to be accumulated and returned to plaintiff for credit on defendant's account and that the amount and value of the defective goods thus returned, and also rejected by plaintiff (plus one delivery made after termination of the purchase order), equalled the amount claimed by plaintiff to represent the balance due on that account, with the result that the account had, in effect, been paid in full.

■■ We have previously held that the general rule in an action in assumpsit to recover money is that evi-

---

① It does not necessarily follow that the characterizing of this action as one for the price would help plaintiff. In an action for the price of goods by a seller under the Uniform Commercial Code, "The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." ORS 72.7170. We did not decide that question, however.

dence of payment cannot be offered under a general denial, but that "payment must be specifically alleged as a matter in avoidance in order to be available," although such evidence may be admissible under a general denial "where no facts are alleged showing the grounds of the indebtedness." *Petty v. Eveland,* 243 Or 556, 559, 414 P2d 349 (1966). See also *Cronn v. Fisher,* 245 Or 407, 424, 422 P2d 276 (1966). Cf. *Beemer v. Lenske,* 241 Or 47, 49, 402 P2d 90 (1965), and *Gaswint v. Amigo Motor Homes,* 96 Adv Sh 1680, 1686-687, 265 Or 248, 509 P2d 19 (1973).[2]

We have also held, in *Smith v. Mills,* 112 Or 496, 501-02, 230 P 350 (1924), that:

"* * * In the absence of any agreement, either expressed or clearly implied, payment means the discharge of a debt or obligation in money, and in such case money is the sole medium of payment: [citing cases].

"But anything of value delivered by the debtor and accepted by the creditor in discharge of the debt will constitute payment: [citing cases]. In such case it is the distinct agreement of the creditor to accept the thing in discharge of the debt that gives it the character of payment: [citing cases]."

Accordingly, based upon the evidence offered by defendant in this case, it would appear that defendant might well have been entitled to plead such a defense in this case. It also appears from plaintiff's opening statement, as well as from the previous correspondence

---

[2] An Action on Account has been described as "* * * an Action of Assumpsit or Debt which is for recovery of money only for services performed, property sold and delivered, money loaned, or damages for the nonperformance of Simple Contracts, Express or Implied, when the rights of the parties will be adequately conserved by the payment and receipt of money." Dahlberg v. Fisse, 328 Mo 213, 220, 40 SW2d 606, 609 (1931).

between the parties, that it was fully understood by plaintiff that defendant had taken the position that "the account had been paid down by the defendant" to a balance which defendant claimed to represent the amount for which it was entitled to credit for goods returned by it to plaintiff.

The question to be decided, however, is the more narrow question whether, in this context, plaintiff is correct in its contention that the evidence offered by defendant was not relevant under the allegations of defendant's affirmative defense; that such allegations were not broad enough to make it proper to receive this offered evidence, and that by such allegations defendant limited itself to proof of defective goods in what plaintiff refers to as "the last eight invoices," so as to foreclose proof of defective goods delivered under any of the previous invoices.

We do not believe that in this context defendant's pleadings can properly be construed in such a narrow manner. We start with the fact that this is an action on an account and that defendant's affirmative defense is in answer to the allegations of plaintiff's complaint that:

"Defendant is indebted to plaintiff in the sum of $4,770.88 for *the balance of an account for various items of personal property sold to defendant between the dates of November 3rd, 1965, and April 4th, 1966,* which items are more particularly described in Exhibits A, B, C and D attached hereto * * *."

Defendant's affirmative answer first alleges an agreement for delivery of "dampers" which were "of equal or superior quality" to certain "samples." It then alleges that "plaintiff failed to manufacture and deliver

the aforementioned items" of "like or equal quality to the samples," and that "defendant gave plaintiff prompt notice of said failure and of defendant's intent to reject said goods, and further of defendant's refusal to pay for same."

Up to this point it was clear that defendant's allegations were not limited to the deliveries made under the eight invoices attached to the complaint, but intended to refer generally to what the complaint referred to as "the various items of personal property sold to defendant between the dates of November 3rd, 1965, and April 4th, 1966." Defendant then alleged:

"That the *within action on account* is composed and made up of the items delivered to the defendant *that failed to meet the foregoing standards."* (Emphasis added)

Plaintiff says, in effect, that by this allegation defendant has limited the evidence admissible under defendant's affirmative defense to the items delivered under the eight invoices attached to the complaint because "the within action on account is composed and made up" of only those "items."

It must be conceded that this is one possible interpretation of defendant's pleading. We believe, however, that in the context of this case as it was actually tried, including plaintiff's opening statement and opening case, as previously discussed, it should then have been clear to the trial court that the "items" which defendant intended to refer to by the allegations of its affirmative defense were not intended to be limited to the "items" included in those eight invoices, but extended to all of the "items" delivered under this contract and included in arriving at the "balance" in the "account" for which plaintiff seeks to recover.

It should also have been clear to the trial court at that stage of the trial, both from plaintiff's opening statement and evidence and from the correspondence offered in evidence by plaintiff, that in 1966 plaintiff had been fully informed of defendant's position to that effect and that this was what gave rise to the "controversy" which resulted in this lawsuit.

■ Under these circumstances we hold that the evidence offered by defendant was relevant to the issues arising from the allegations of defendant's affirmative defense and that it was error to exclude such evidence upon objection that such evidence was irrelevant.[9]

It may be that the allegations of defendant's affirmative defense were ambiguous and, perhaps, incomplete. However, no demurrer or motion to make more definite and certain was filed. The sole issue to be decided is whether the evidence included in defendant's offer of proof was relevant to the issues arising under the allegations of defendant's affirmative defense.

In this state of the record we believe that such evidence was relevant and that these allegations were sufficient to put plaintiff on notice that defendant would take the same position on trial as taken by it in previous correspondence, i.e., that the balance on the

---

[9] By offering in evidence all of over 100 invoices, in addition to these eight invoices as well as the ledger account showing other ledger entries, plaintiff may also have waived or have been estopped from objecting to offers of evidence by defendant relating to other invoices or other entries rejected in the final balance of that ledger account. See Oregon-Wash. etc Co. v. Spokane etc R. Co., 83 Or 528, 540, 163 P 600, 163 P 989 (1917), and McCormick on Evidence (2d ed 1972) 128, § 55. Cf. 1 Wigmore on Evidence (3d ed 1949) 307-309, § 15. We need not decide that question, however, and it was not raised by either party at the time of trial.

account which plaintiff seeks to collect was, in effect, the value of the defective items which had been returned by defendant to plaintiff and rejected by it.

We must therefore remand this case for further proceedings not inconsistent with this opinion. Because of this disposition of the case we need not consider defendant's assignment of error relating to the refusal of the trial court to permit it to amend the allegations of its affirmative defense.

■ Defendant's remaining assignment of error is that the trial court erred in denying its contention that the recovery for the sale of goods under all but one of the eight invoices was barred by the six year statute of limitations, ORS 12.080 and 12.090. Whether or not the six year statute of limitations might otherwise have run on the sales made under some of these invoices, the subsequent part payment on the balance due on this account had the effect of tolling the running of the statute of limitations. ORS 12.240; *Horsfall v. Logan,* 72 Or 150, 154, 142 P 760 (1914). See also *Douglas Creditors Ass'n v. Padelford,* 181 Or 345, 359, 182 P2d 390 (1947), and Annot., 45 ALR3d 446, 453 (1972).

Reversed and remanded.