# PROGRESS QUARRIES, INC.,
*Respondent/Cross-Appellant,*
*v.*
# LEWIS ET UX,
*Appellants/Cross-Respondents.*
## (TC 33-622, SC 25192)
575 P2d 158

Fred A. Anderson, of Anderson, Dittman & Anderson, Tigard, argued the cause and filed the briefs for appellants/cross-respondents.

Thomas J. Moore, of Brink, Moore, Brink & Peterson, Hillsboro, argued the cause for respondent/cross-appellant. With him on the brief were Rives, Bonyhadi & Drummond, Portland.

Before Denecke, Chief Justice, and Tongue and Linde, Justices, and Richardson, Justice Pro Tempore.

TONGUE, J.

## TONGUE, J.

This is an action by the assignee of a guaranty agreement to enforce the terms of that agreement against the original guarantors. The case was tried before the court, without a jury. Defendants appeal from a judgment in favor of plaintiff in the sum of $6,438.92, plus $10,895 in attorney fees. We affirm.[1]

■■ Because defendants, by their appeal in this case, challenge the findings of fact and conclusions of law by the trial judge, we begin with the well-established rule that in an action at law we must affirm the findings of fact and conclusions of law of the trial court and the judgment based upon them if they are supported by any evidence. *See Cronn v. Fisher,* 245 Or 407, 415, 422 P2d 276 (1966). Those findings and conclusions are as follows:

### *"FINDINGS OF FACT*

"The Court finds that Gary Lewis on behalf of his company Lewis Construction Company (Company) was having difficulty financing his quarry operations and requested assistance from his lessor. Morrison Conway, Jr., President of Progress Quarries, Inc. (Progress), the lessor, offered to help.

"As of October 4, 1972, the company owed about $48,000 to the U.S. National Bank of Oregon (Bank). The Court finds that Gary Lewis and his wife Margaret had earlier executed an unlimited and personal guarantee to the Bank of corporate notes. These notes were secured by a document titled: Security Agreement Covering Accounts, Contract Rights and Chattel Paper which essentially pledged the company's receivables to the Bank.

"Shortly before October 4, 1972 the Bank had notified both the Company and Progress that the notes would be called in and further financing would have to be obtained elsewhere. The Court finds that Gary Lewis requested Morrison Conway to finance the Company

---

[1] Plaintiff cross-appealed from the striking from plaintiff's complaint of allegations of loans made after assignment of the guaranty agreement. We also affirm that ruling by the trial court.

through Progress. Mr. Conway had agreed to this by an offer to take over for the Bank. In this setting a meeting was held at the Bank, among the Bank, the Company and Progress on October 4, 1972.

"The Court finds that it was the intent of Gary Lewis, Morrison Conway and officers of the Bank to have Progress take an assignment of all the Bank held relative to the Company. As a result of the meeting, Progress drew a check for $30,000 in favor of the Company; the Company drew a check in favor of the Bank for $24,169.02 which with the addition of an approximate $26,000 in a Cash Collateral Account satisfied the Bank. The Bank attempted to assign the notes, security agreements, securities, personal guarantee and all other related documents over to Progress. Further the Bank took the balances of all the notes and reduced them to zero but neither stamped them paid or returned them to the borrower as is their practice. The Court finds that the notation of a zero balance on the notes was a mistake and none of the three parties intended that the notes be retired.

"The Court finds that there were certain set offs and credits which should have been applied to the Company notes to reduce their balance to $22,800.94 as of October 4, 1972. Further, a past due sum of $258.95 was owing as of that date. Likewise due was $800, the agreed value of the Company's work at the private residence of Progress' president. While this work at the residence may have been done in furtherance of an existing good relationship between the Company and Progress, it became a claim which both parties recognized when the relationship broke down.

"When the $30,000 check mentioned above was written, Mr. Conway made a note in his checkbook: $12,000 Embankment (17¢ × ?) 18,000 loan. The Court finds that Mr. Conway's intent was to advance an immediate $30,000 to the Company but at the same time recognize a credit of approximately $12,000 which was owing but not yet precisely figured. The '17¢ × ?' indicated the formula for determining the credit which was the 17¢ rate per cubic yard of quarry material. Subsequently, this figure was determined to be $10,150, not the estimated $12,000.

"This Court finds that the Company did not direct the application of payments or credits.

## "*CONCLUSIONS OF LAW*

"The intent of the parties governs the transactions at the October 4, 1972 meeting. The intent of all was that Progress would take all rights and duties of the Bank. It would be a hardship and certainly contrary to reason and logic to rule that the $30,000 check to the Company followed by an essentially simultaneous check to the Bank would defeat the creditor. It would also be inappropriate judicial interference for the Court to find this transaction retired the notes and left the creditor unsecured. The intent of the parties also leads to the inescapable conclusion that a note teller made a mistake in reducing the note balance to zero.

"The Court further concludes that the intent of Mr. Conway was to have Progress advance $30,000 to the Company but recognize that part of that would be paid by credit of approximately $12,000, the exact dollar amount to be determined later. The effect of the checkbook notation was to assign the later determined $10,150 payment to stop the interest as of October 4, 1972. The Court also concludes that the claim for $800 for residence work and $258.95 past due were assignable to October 4, 1972.

"The Court notes that the Company did not request any particular application of its payments of credits. The payee then has the right to apply them to their best advantage. The Court finds that Progress applied the $10,150 embankment credit to the $30,000 advance. Accordingly, that portion of the advance which was not secured through notes or other security was retired first. Since this reduced the balance below the assigned notes, it is unnecessary to consider defendant's arguments that the difference between $30,000 and the Bank notes is not covered by the Lewis' personal guarantee.

[ 445 ]

"The following accounting should illustrate the Court's conclusions:

| "10/4/72 | $30,000 | Advance |
| | 10,150 | Embankment Credit |
| | $19,850 | Total |
| | 800 | Residence Credit |
| | 19,050 | Total (Carried Forward) |
| | 258.95 | Past Due Account |
| | 18,791.05 | Total |
| 10/20 | 1,790.58 | Royalty Credit |
| | 17,072.55 | Total |
| | 72.08 | 8¾% interest, 16 days |
| | 17,072.55 | Total |
| 10/24 | 10,650.00 | Ross Bros., payment |
| | 6,422.55 | Total |
| | 16.34 | 8¾% interest, 4 days |
| | 6,438.92 | Total covered by Gary & Margaret Lewis' personal guaranty. |

"Accordingly, plaintiffs will have judgment for $6,438.92 and interest from October 24, 1972, together with their costs, disbursements and reasonable attorney fees."

Defendants' principal contention is that the "[t]rial court erred by disregarding rules of law binding upon the parties and upon the court in holding that the special Guaranty in favor of the Bank was not extinguished through payment of all obligations to Bank by Lewis Construction Company."

These "rules of law" are contended by defendants to be as follows:

"(a) That as a matter of law the special Guaranty (Ex. 8) by defendants to the United States National Bank in 1969, by its express terms applied only to monies loaned by the Bank to Lewis Construction Company and not to monies loaned to Lewis Construction Company by Progress Quarries, Inc., or any other lender.

"(b) That Lewis Construction Company's check of October 4, 1972 (Ex. 13), drawn payable and delivered to

[ 446 ]

U.S. National Bank represented full payment by Lewis Construction Company of all obligations and more to the Bank, thereby, as a matter of law, discharging defendants as guarantors under the special Guaranty agreement (Ex. 8).

"(c) That as a matter of law, plaintiff, Progress Quarries, was bound by its own recorded acts and recorded intentions, as reflected on its records (Ex. 12) and as testified by its chief officer Conway, that its check for $30,000 (Ex. 14) drawn payable to Lewis Construction Company constituted $12,000 embankment (17¢ × ?) payment on debt due Lewis Construction plus '$18,000 loan' to Lewis Construction Company, and said payment was intentionally not made to the Bank (Tr. 1A-28), and no purchase of anything from Bank by plaintiff resulted, and no transaction resulted therefrom between Bank and Progress Quarries as a matter of law.

"(d) That as a matter of law, the fact that Progress Quarries, Inc. was indebted to Lewis Construction Company on October 4, 1972, in a sum not less than $13,499.53, including the $10,150 net embankment payment, and Lewis Construction owed Progress Quarries no sum whatsoever, Lewis Construction Company was entitled to apply such amounts of Progress Quarries' $18,000 loan against the remaining indebtedness after four other notes to U.S. Bank were fully paid and discharged from the Lewis Construction's cash collateral account on October 4, 1972, thereby extinguishing all obligations to which Guaranty agreement (Ex. 8) had previously been applicable."

Defendants also contend, among other things, after reference to various portions of the transcript of testimony and other evidence, that:

"Intentions in many cases are reliably determined by actions of the parties and written documents in evidence rather than their words, and if a mistake as to the legal effect of the action taken occurred, it is not chargeable to defendants or either of them. * * *"

and that:

"* * * [W]hatever may have been the accommodation of Progress Quarries intended by the Bank in assigning paid paper to Progress Quarries its president, Conway,

[ 447 ]

intended, as he testified, only to pay an account due Lewis Construction Company and to loan $18,000.00 additional, and not make any payment to the Bank in exchange for the fully acquitted notes and discharged guarantee. * * *"

It is true, as contended by defendants that there was evidence which would have supported such findings of fact by the trial court. We find, however, upon examination of the record in this case, that the evidence on the controlling question of the intent of the parties was conflicting and that the findings of fact of the trial court to the contrary are supported by substantial evidence. Among that evidence is the following.

Mr. Conway, president of plaintiff Progress Quarries, Inc., testified that:

"A. Lewis asked me on behalf of Lewis Construction company if I would take the bank's place.

"* * * * *

"A. Well, he said that he had been to the bank and that they were not going to give him any more money. That he had given his personal guarantee and some other collateral and his account receivables to the bank and felt that it was a reasonably safe investment and he asked me if I would take the bank's place because they weren't going to give him any more money."

He also testified that when he entered into the transaction of October 4, 1972:

"A. My intent was to step into the bank's shoes.

"Q. In other words, Progress Quarries?

"A. Progress Quarries. And to make advances on receivables and collect funds as they were collected, and I would have the same security as the bank had.

"Q. Namely ——?

"A. The note, the guaranty, the stock collateral — whatever the bank had. That's what I was to have."

He also testified that on a subsequent occasion Mr. Lewis "reminded me at that time * * * that I had his personal guarantee * * *" and that in subsequent

[ 448 ]

conversations he never denied liability under the guaranty agreement.

Mr. Jensen, who represented the bank at the meeting on October 4, 1972, testified that:

"The intent was to put Mr. Conway of Progress Quarries in the bank's position with respect to these obligations and security."

The guaranty agreement, by its terms, was a guaranty and promise to pay to the bank, "its successors and assigns" all indebtedness of the Lewis Construction Company to the Bank. At the meeting of October 4, 1972, that guaranty agreement was assigned in writing "without recourse to Progress Quarries Inc." Each of the promissory notes secured by it was also endorsed "without recourse pay to the order of Progress Quarries Inc." Both the guaranty and the note were delivered to plaintiffs.

It is true, however, that at or about the same time notations were made on each of these notes showing no balance payable on them. Mr. Cook, who also represented the bank at that meeting, testified that these notations were "pure error" by the note teller; that he would not assign a note if nothing was owing on it; that the normal practice when a note is paid in full is to stamp it as "paid" and return it to the borrower and that this was not done in this case. Other bank employees testified to the same effect.

The following testimony on deposition by defendant Gary M. Lewis was also received in evidence:

"Q. And it was your understanding that the guarantee which you and Mrs. Lewis had given to the bank would then become a guarantee to Progress Quarries?

"A. Well, it would be signed over to Progress Quarries, yes.

"MR. MOORE:

"But my question is relating specifically now to the personal guarantee, was it not your understanding and your intention that by whatever means it would be accomplished the personal guarantee which you and

Mrs. Lewis had given to the bank would end up being given to Progress Quarries?

"A. Well, I knew that was going to happen along with the stocks, yes.

"\* \* \* \* \*

"Q. So, after the bank's paid off by Progress Quarries, Progress Quarries would hold the notes?

"A. Have the notes, that's right.

"Q. And was it not your understanding that as a result of that transaction, to put it another way, Progress Quarries would hold the notes and be in a position of asserting them against you, it rather, the matter of the note, of the construction company?

"A. Yes, sir.

"Q. So, at the time your discussions with Mr. Conway and at the time of the arrangement as it was actually made with the bank, you never had the understanding that the notes were being paid and retired did you?

"A. No. The bank was paid and retired, that's right, but the notes were transferred also."

It would serve no useful purpose to summarize the facts in further detail. Based upon our examination of the record, however, we hold that the findings of fact, conclusions of law and judgment by the trial court were supported by substantial evidence.

The "rules of law" which, according to defendants, were "disregarded" by the trial court rest upon the assumption that, as a matter of law, the pre-existing promissory notes from Lewis to the bank were all "extinguished" and that, as a matter of law, this also extinguished the guaranty agreement and discharged the defendants as guarantors under the agreement.[2] We hold, on the contrary, that there was substantial evidence to support the findings of fact and conclusions of law by the trial court to the effect that neither

---

[2] We have examined the various cases cited by defendants in support of these "rules of law" and find that none of them are controlling so as to require a holding in favor of defendants "as a matter of law," as contended by them.

these notes nor the guaranty agreement were extinguished, but that they were assigned to plaintiff so as to place it in the same position as the bank had been as the previous holder of the notes and guaranty agreement.[3]

Defendants also assign as error the award by the trial court to plaintiff of attorney fees in the sum of $10,895. Defendants contend that the trial court abused its discretion in allowing so large an amount as attorney fees to collect a debt of $6,438.92.

■■ An award of attorney fees is not a matter of discretion, subject to reversal only for abuse. Instead, the question of what is a reasonable attorney fee to be awarded in a particular case is an issue of fact to be determined as any other issue of fact. Thus, an award of attorney fees by a trial court must be affirmed by this court if supported by substantial competent evidence. *Waggoner v. Oregon Auto Ins. Co.,* 270 Or 93, 100, 526 P2d 578 (1974).

Upon examination of the record we find, among other things, that numerous motions were filed by both parties; that the case finally went to trial on plaintiff's sixth amended complaint; that each of the two defendants, by their answers, asked for an award of $7,500 in attorney fees; that the trial of the case took three days; that, according to the records of plaintiff's attorneys, they devoted a total of 232.5 hours to this

---

[3]Defendants also assign as error the refusal of the trial court "to hear defendants' objections to trial court findings, timely filed, in refusing to consider defendants' requests for other and different findings timely filed, and in summarily entering judgment as requested by plaintiff." It appears from the record, however, that the trial court did consider and reject defendants' objections and proposed findings. It also appears that the trial judge "summarily" entered judgment as requested by plaintiff, but did so because that judgment "conformed" to his previous memorandum opinion.

As for the assignment of error on cross-appeal by plaintiff that the trial court erred in striking from plaintiff's complaint allegations of loans made after the assignment, we agree with defendants that the guaranty agreement was limited to loans made by the bank and did not extend to such subsequent loans and that the case of *Meader v. Orbit Inn Corporation,* 276 Or 921, 556 P2d 1365 (1976), cited by plaintiff, is not controlling on this point.

case, and that, according to the testimony of another attorney, as an expert witness, an award of approximately $48 per hour, or a total of $10,895, as billed to plaintiff by its attorneys, is a reasonable attorney fee under the facts and circumstances of this case. Although the award by the trial court was large, in relation to the amount involved in this litigation, and although another attorney testified that $3,000 would be a reasonable attorney fee, we cannot say that the award of attorney fees by the trial court was not supported by substantial evidence.

The judgment of the trial court is affirmed.