Argued March 29, affirmed June 25, 1979

# WARRINGTON, *Appellant,*
v.
# TRANSAMERICA TITLE INSURANCE COMPANY,
*Respondent*
(No. A7606-07778, CA 11278)
596 P2d 627

George R. Waldum, Portland, argued the cause and filed the brief for appellant.

John R. Faust, Jr., Portland, argued the cause and filed the brief for respondent. With him on the brief was Hardy, McEwen, Newman, Faust, and Hanna, Portland.

Before Schwab, Chief Judge, and Thornton, Gillette and Campbell, Judges.

CAMPBELL, J.

**CAMPBELL, J.**

Plaintiff Warrington brought an action against defendant Transamerica Title Insurance Co. (Transamerica) for damages in counts of fraud and negligence, for Transamerica's failure to disclose to the plaintiff a second mortgage on property that plaintiff purchased, and in contract for Transamerica's failure to issue him a title insurance policy and defend against the mortgage. The trial court sitting without a jury ruled for Transamerica on all three counts. Plaintiff appeals. We affirm.

This case arose out of a series of real estate transactions concerning, in addition to Warrington and Transamerica, several parties not involved in the present litigation. In April, 1972, Delta Sigma Fraternity, known as PSI Chapter of Delta Sigma Delta (PSI), agreed to sell a parcel of land in the City of Portland to Great Western Construction Co. (Great Western) for $37,500. Great Western paid $10,000 upon execution of the deed. The parties agreed that the remaining $27,500 was to be secured by a mortgage. The parties contemplated that the property would be developed as a multiple unit dwelling, that Great Western would obtain a $140,000 construction loan from Oregon Mutual Savings Bank [Oregon Mutual], and that PSI's mortgage would be subordinate to the construction mortgage. The PSI-Great Western transaction was closed in escrow with Transamerica. The escrow instructions given Transamerica stated, *inter alia,* that Transamerica was not to record PSI's mortgage until advised to do so by Great Western. Subsequently, Great Western obtained its construction loan and Oregon Mutual's mortgage was recorded. Great Western, however, never advised Transamerica to record the PSI mortgage.

In August, 1972, Great Western sold an undivided one-half interest in the property to Robert Martin. The bargain and sale deed used in the transaction recites in part that it was "free of all encumberances [*sic*]

[843]

except mortgage to Oregon Mutual Savings Bank for $140,000.00 and a second mortgage to PSI Chapter of Delta Sigma Delta Building Corporation for $12,500.00."[1] This deed was recorded April 11, 1973.

On June 14, 1973, Great Western executed a deed to the subject property to Warrington. This deed, recorded June 15, 1973, recites, *inter alia,* that Warrington "agrees to assume mortgages of record and to deed a 1/2 undivided intrest [*sic*] to Robert Martin."

During the negotiations preceding the transaction, Great Western provided Warrington with a preliminary title report issued by Transamerica, dated June 13, 1973. This report had been prepared as part of a different transaction not involving Warrington, with copies sent to Martin, Martin's attorney, and Lanny Holmes, president of Great Western. The report, upon which Warrington relied, did not disclose Martin's undivided one-half interest in the property or PSI's mortgage.

Warrington also testified that prior to closing the deal he called Transamerica and received a "verbal update" on the report from Bell, an escrow officer there. This "verbal update," upon which Warrington assertedly relied, also did not disclose either Martin's interest or PSI's mortgage.

The following month Warrington negotiated the exchange of certain real property he owned to Martin, in exchange for Martin's interest in the subject property. Warrington testified that on July 27, 1973, prior to closing the deal with Martin, he again contacted Bell, the escrow officer, by phone and received a "verbal update" on the June 13, 1973, preliminary title report. This alleged "verbal update" again failed to disclose PSI's mortgage. Warrington assertedly relied on this "verbal update" in closing the deal on August 1, 1973.

---

[1] There was no $12,500 mortgage on the property held by PSI. The testimony of Great Western's president suggests that the reference to the $12,500 "mortgage" was a result of Great Western's intent to pay $15,000 of the $27,500 mortgage before Martin purchased the property.

At about the time Warrington was considering the purchase of Martin's interest in the property, he was also considering increasing the Oregon Mutual construction mortgage by $10,000. On July 24, 1973, he placed an order with Transamerica, to be billed to Oregon Mutual, for an owner's title insurance policy in the amount of $190,000 and a mortgagee's policy in the amount of $150,000. Transamerica issued a preliminary report dated July 27, 1973, addressed to Oregon Mutual, showing title in Martin and Warrington, and listing among the exceptions the following:

> "Mortgage, including the terms and provisions thereof, dated April 30, 1972, recorded April 11, 1973, in Book 920, Page 217, Mortgage Records, given to secure the payment of $12,500.00 with interest recorded thereon and such future advances as may be provided therein, executed by Great Western Construction Co. to PSI Chapter Delth Silma Delta [*sic*]."

The title report did not mention PSI's $27,500 mortgage. Warrington testified that he did not see this title report before completing the transaction with Martin.

On or about August 2, 1973, Dr. Tinkle, president of PSI's building corporation, having received notice that the property was subject to some liens, contacted Lanny Holmes at Great Western attempting to collect the mortgage payments. Holmes informed Tinkle that Warrington owned the property. Tinkle then contacted Warrington, informing him of PSI's interest in the property. Warrington testified that Tinkle's call was his first notice of PSI's mortgage, which was still in Transamerica's escrow file, unrecorded.

Tinkle contacted an attorney, Joyce, who determined that PSI's mortgage had never been recorded. Joyce contacted Transamerica and arranged for the recording of the mortgage; the mortgage was recorded August 10, 1973.

On August 13, 1973, or shortly thereafter, Transamerica issued another preliminary title report, also dated July 27, 1973, which listed not only PSI's "mortgage" of $12,500, but PSI's mortgage of $27,500.

In December, 1974, PSI filed a foreclosure proceeding against Warrington. Warrington tendered the defense of the action to Transamerica, which refused the tender. PSI prevailed and Warrington paid PSI $27,500 plus interest, costs, and attorney's fees.

Warrington then sued Transamerica, alleging the following: (1) Transamerica fraudulently misrepresented the state of the title to the subject property in its June 13, 1973, title report and the June 14, 1973, "verbal update" by failing to disclose the $27,500 PSI mortgage held in Transamerica's escrow department, and fraudulently failed to disclose the mortgage after Warrington ordered a title report on July 24, 1973; (2) Transamerica was negligent in failing to disclose the mortgage in the June 13, 1973, title report, the June 14, 1973, "verbal update," and following the July 24, 1973, title policy order; and (3) Transamerica breached its contract with Warrington by (a) failing to issue a title insurance policy which would have protected him against PSI's mortgage, and (b) failing to defend and indemnify Warrington against that mortgage. The trial court ruled against Warrington on all three counts.

■■ For Warrington to be able to recover in fraud, he must be able to demonstrate, among other things, that he justifiably relied on misrepresentations by Transamerica. *See e.g., Rice v. McAlister,* 268 Or 125, 519 P2d 1263 (1974); Restatement (Second) of Torts §531 (1977). Warrington asserts that he relied on the June 13, 1973, title report, along with the alleged June 14, 1973, "verbal update," in closing the June 14, 1973, transaction with Great Western. He asserts that he relied on the same report and the alleged July 27, 1973, "verbal update" in closing the August 1, 1973, transaction with Martin. The trial court found that Warrington never received any "verbal updates" as to the state of the title. Since there is competent evidence in the record to support this finding, we are bound thereby. *Cronn v. Fisher,* 245 Or 407, 422 P2d 276

(1966). Therefore, the sole issue here is Warrington's right to rely on the June 13, 1973, preliminary title report.

■ The June 13, 1973, title report states, *inter alia,* that it "shall become *null and void* unless a policy is issued, and the full premium therefore paid." (Emphasis added.) This language unambiguously informs the reader that, unless he as an insured party obtains a title insurance policy, he may expect no protection from the representations contained in the preliminary report. As stated above, Warrington was a stranger to the transaction for which the June 13, 1973, preliminary report was prepared. In light of the circumstances under which he saw the report and the language contained therein, he was not justified in relying on the representations in that report as to the state of title to the subject property. We conclude that the trial court properly ruled against Warrington on his count in fraud.

Warrington's count in negligence falls within the ambit of Restatement (Second) of Torts § 552(1) and (2) (1977) which provide:

> "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> "(2) Except as stated in Subsection (3), [concerning persons under a public duty to give information; not applicable here], the liability stated in subsection (1) is limited to loss suffered
> "(a) by the person or one of a limited group of persons for whose benefit and guidance he *intends* to supply the information or *knows* that the recipient intends to supply it; * * *"

[847]

In explaining the intended reach of this section, Comment h states:

" \* \* \* \* \* \*."

" \* \* \*. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, *distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.* It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. *It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated."* (Emphasis added.)

■ Warrington presented absolutely no evidence to suggest that Transamerica *intended* anyone to see the June 13, 1973, title report other than the parties to whom copies were sent. Further, Warrington presented no evidence that Transamerica *knew* that any of the parties to whom copies of the report were sent would supply the report to others. Therefore, even assuming that Transamerica was negligent in the preparation of the June 13, 1973, title report, Warrington was outside of the scope of Transamerica's liability here, under the legal standard recited in the Restatement.

■ In Warrington's third count, he argued that Transamerica breached an agreement to issue title insurance. He correctly characterizes the first July 27, 1973, preliminary title report as an offer to issue a title insurance policy. That report states, *inter alia,*

that Transamerica is "prepared" to issue a title policy according to certain terms and subject to certain exceptions, and that "This Report is preliminary to the issuance of a policy of title insurance and shall become null and void unless a policy is issued, and the full premium therefore paid." Warrington never testified that he accepted the offer to issue a policy. He testified that he received the preliminary report after closing the August 1, 1973, transaction. He presented no evidence that he ever communicated to Transamerica an acceptance or tendered the required premium. The record demonstrates that sometime after August 1, 1973, Warrington indicated to Transamerica that the Oregon Mutual mortgage transaction, for which the July 27, 1973, title report was ordered, was not going to go through so that no title insurance would be necessary. Therefore, there was no contract between Warrington and Transamerica. The trial court did not err in ruling against Warrington on his count in contract.

Affirmed.